# SPAZIANO *v.* FLORIDA

No. 83–5596.   Argued April 17, 1984—Decided July 2, 1984

448

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL and O'CONNOR, JJ., joined; in all but a portion of page 456 in Part II of which WHITE and REHNQUIST, JJ., joined; and in Part II of which BRENNAN, MARSHALL, and STEVENS, JJ., joined. WHITE, J., filed an opinion concurring in part and concurring in the judgment, in which REHNQUIST, J., joined, *post*, p. 467. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 467.

*Craig S. Barnard* argued the cause for petitioner. With him on the brief were *Richard L. Jorandby, Richard H. Burr III,* and *Richard B. Greene.*

*Mark C. Menser,* Assistant Attorney General of Florida, argued the cause for respondent. With him on the brief was *Jim Smith,* Attorney General.*

JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents questions regarding the administration of Florida's capital sentencing statute. In particular, petitioner challenges the trial court's failure to instruct the jury on lesser included offenses of capital murder. He also challenges the court's imposition of a sentence of death when the jury had recommended life. We conclude that on the facts of this case, it was not error for the trial judge to refuse to give the lesser included offense instruction and that there is no constitutional requirement that the jury's recommendation of life be final. We also reject petitioner's argument that, as applied in this case, the Florida standards for overriding a jury's sentencing recommendation are so broad and vague as to violate the constitutional requirement of reliability in capital sentencing.

---

*Ramsey Clark, Richard W. Ervin,* and *Thomas A. Horkan, Jr.,* filed a brief *pro se* as *amici curiae.*

## I

Petitioner Joseph Robert Spaziano was indicted and tried for first-degree murder. The indictment was brought two years and one month after the alleged offense. Under the Florida statute of limitations in effect at the time of the alleged offense, August 1973, the limitations period for noncapital offenses was two years. Fla. Stat. § 932.465(2) (1973).[1] There was no statute of limitations for capital offenses, such as first-degree murder. § 932.465(1).

The primary evidence against petitioner was given by a witness who testified that petitioner had taken him to a garbage dump in Seminole County, Fla., where petitioner had pointed out the remains of two women he claimed to have tortured and murdered. Petitioner challenged the sufficiency of the witness' recall and perception because of a substantial drug habit. The witness testified that he had not taken drugs on the day of the visit to the garbage dump, and he had been able to direct the police to the site. See *Spaziano* v. *State*, 393 So. 2d 1119, 1120 (Fla. 1981).

At the close of the evidence, the trial court informed petitioner that it would instruct the jury on the lesser included, noncapital offenses of attempted first-degree murder, second-degree murder, third-degree murder, and manslaughter, if petitioner would waive the statute of limitations as to those offenses. Tr. 751–755. Petitioner refused to waive the statute. The court accordingly instructed the jury solely on capital murder.

The jury deliberated somewhat more than six hours. It reported itself deadlocked, and the trial court gave an additional instruction, encouraging the jurors to resolve their dif-

---

[1] Under the current Florida statute, there is no limitation period on capital and life felonies. There are, however, a 4-year limitation period on first-degree felonies, and a 3-year limit on prosecutions for all other felonies. Fla. Stat. § 775.15 (1983). Under Florida law, the statute of limitations in effect at the time of the alleged offense governs. *Florida ex rel. Manucy* v. *Wadsworth*, 293 So. 2d 345, 347 (Fla. 1974).

ferences and come to a common conclusion.[2]   Shortly thereafter, the jury returned a verdict of guilty of first-degree murder.

The trial court then convened a sentencing hearing before the same jury.   Arguments were heard from both sides and evidence offered on aggravating and mitigating circumstances.   A majority of the jury recommended life imprisonment.[3]   In Florida, the jury's sentencing recommendation in a capital case is only advisory.   The trial court is to conduct its own weighing of the aggravating and mitigating circumstances and, "[n]otwithstanding the recommendation of a majority of the jury," is to enter a sentence of life imprisonment or death; in the latter case, specified written findings are required.   Fla. Stat. § 921.141(3) (1983).[4]   The trial court

---

[2] The court instructed the jury as follows:
"Ladies and gentlemen, it is your duty to agree upon a verdict if you can do so without violating conscientiously held convictions that are based on the evidence or lack of evidence.   No juror, from mere pride or opinion hastily formed or expressed, should refuse to agree.   Yet, no juror, simply for the purpose of terminating a case, should acquiesce in a conclusion that is contrary to his own conscientiously held view of the evidence.   You should listen to each other's views, talk over your differences of opinion in a spirit of fairness and candor and, if possible, resolve your differences and come to a common conclusion, so that a verdict may be reached and that this case may be disposed of."   Tr. 817–818.

This instruction is commonly referred to as an *Allen* or "hammer" charge.   See *Allen* v. *United States*, 164 U. S. 492 (1896).

[3] By agreement of the parties, the jury was not polled.   Sentencing Tr. 28–29 (Jan. 26, 1976).

[4] The Florida capital sentencing statute in effect at the time of petitioner's trial, January 1976, is not identical to that currently in effect. In 1976, the statute directed the sentencer to determine whether statutory aggravating circumstances were outweighed by statutory mitigating circumstances.   See 1972 Fla. Laws, ch. 72–724.   The current statute directs the sentencer to determine whether statutory aggravating circumstances are outweighed by any mitigating circumstances.   §§ 921.141(2)(b), (3)(b) (1983), as amended by 1979 Fla. Laws, ch. 79–353.   There is no suggestion in this case that either the jury or the trial judge was precluded from considering any nonstatutory mitigating evidence.   Cf. *Barclay*

452

concluded that, "notwithstanding the recommendation of the jury, . . . sufficient aggravating circumstances existed to justify and authorize a death sentence[;] . . . the mitigating circumstances were insufficient to outweigh such aggravating circumstances and . . . a sentence of death should be imposed in this case." App. 14. The two aggravating circumstances found by the court were that the homicide was especially heinous and atrocious and that the defendant had been convicted previously of felonies involving the use or threat of violence to the person. The trial court found no mitigating circumstance "except, perhaps, the age [28] of the defendant." *Id.*, at 14–15.

On appeal, the Supreme Court of Florida affirmed the conviction but reversed the death sentence. *Spaziano* v. *State*, 393 So. 2d 1119 (1981). In deciding whether to impose the death sentence, the trial judge had considered a confidential portion of the presentence investigation report that contained information about petitioner's previous felony convictions as well as other charges for which petitioner had not been convicted. Neither party had received a copy of that confidential portion. Relying on *Gardner* v. *Florida*, 430 U. S. 349 (1977), the court concluded that it was error for the trial judge to rely on the confidential information in the presentence investigation report without first disclosing the information to petitioner and giving him an opportunity to present evidence in response.

In a memorandum of supplemental authority, petitioner also urged that *Beck* v. *Alabama*, 447 U. S. 625 (1980), required reversal of his conviction because of the trial court's failure to instruct the jury on the lesser included offenses absent a waiver of the statute of limitations on those offenses. The Supreme Court found *Beck* inapposite. *Beck* concerned an express statutory prohibition on instructions for lesser included offenses. The court found nothing in *Beck* requiring

v. *Florida*, 463 U. S. 939, 947, n. 2 (1983) (STEVENS, J., concurring in judgment).

that the jury determine the guilt or innocence of lesser included offenses for which the defendant could not be convicted and adjudicated guilty. This Court denied certiorari. 454 U. S. 1037 (1981).

On remand, the trial court ordered a new presentence investigation report and scheduled a hearing to allow petitioner to present evidence in response to the report. At the hearing, petitioner offered no evidence. The State presented evidence that petitioner had been convicted previously of forcible carnal knowledge and aggravated battery. Although the State had attempted to introduce evidence of the prior conviction in petitioner's initial sentencing hearing before the jury, the trial judge had excluded the evidence on the ground that the conviction was then on appeal. By the time of the *Gardner* rehearing, the conviction was final and the trial judge agreed that it was a proper consideration. Accordingly, he relied on that conviction in finding the aggravating circumstance that the defendant had been convicted previously of a felony involving the use of violence to the person. The judge also reaffirmed his conclusion that the crime was especially heinous, atrocious, and cruel. He sentenced petitioner to death. App. 25.

The Supreme Court of Florida affirmed. 433 So. 2d 508 (1983). It rejected petitioner's argument that the trial court erred in allowing the State to introduce evidence of a previous conviction not considered in the original sentencing phase. The court noted that the information was in the original presentence investigation report. The only reason it was not considered was that the trial court mistakenly thought that under Florida law it could not be considered, since the conviction was then on appeal.

The Supreme Court also found no constitutional infirmity in the procedure whereby the judge is allowed to override the jury's recommendation of life. The court found no double jeopardy problem with the procedure, because the jury's function is only advisory. The court added its understanding that allowing the jury's recommendation to be binding would

violate the requirements of *Furman* v. *Georgia*, 408 U. S. 238 (1972).

Finally, the court found that in this case the evidence suggesting that the death sentence be imposed over the jury's recommendation of life "meets the clear and convincing test to allow override of the jury's recommendation in accordance with . . . *Tedder* v. *State*, 322 So. 2d 908 (Fla. 1975)." 433 So. 2d, at 511. One judge dissented, finding "no compelling reason" to override the jury's recommendation of life. *Id.*, at 512.

We granted certiorari, 464 U. S. 1038 (1984), and we now affirm.

## II

We turn first to the trial court's refusal to give an instruction on lesser included offenses. In *Beck* v. *Alabama*, *supra*, the Court recognized the risk of an unwarranted conviction that is created when the jury is deprived of the "third option" of convicting the defendant of a lesser included offense. *Id.*, at 637. See also *Keeble* v. *United States*, 412 U. S. 205, 212–213 (1973). We concluded that "[s]uch a risk cannot be tolerated in a case in which the defendant's life is at stake" and that "if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [a State] is constitutionally prohibited from withdrawing that option from the jury in a capital case." 447 U. S., at 637–638. The issue here is whether the defendant is entitled to the benefit of both the lesser included offense instruction and an expired period of limitations on those offenses.[5]

---

[5] We note that although the Court has not specifically addressed the question presented here, it has assumed that if a defendant is constitutionally entitled to a lesser included offense instruction, the trial court has authority to convict him of the lesser included offense. See *Keeble* v. *United States*, 412 U. S. 205 (1973); *id.*, at 215–217 (Stewart, J., dissenting on the ground that the Court's decision improperly conferred jurisdiction in the federal district court over crimes not enumerated in the Major Crimes Act, 18 U. S. C. §§ 1153, 3242).

Petitioner urges that he should not be required to waive a substantive right—to a statute of limitations defense—in order to receive a constitutionally fair trial. *Beck* made clear that in a capital trial, a lesser included offense instruction is a necessary element of a constitutionally fair trial. Thus, petitioner claims, he is entitled to the benefit of the *Beck* rule regardless of whether the statute of limitations prevents him from actually being punished on a lesser included offense.

We, of course, have no quarrel with petitioner's general premise that a criminal defendant may not be required to waive a substantive right as a condition for receiving an otherwise constitutionally fair trial. We do not agree that the premise fairly applies to petitioner's situation. Petitioner would have us divorce the *Beck* rule from the reasoning on which it was based. The element the Court in *Beck* found essential to a fair trial was not simply a lesser included offense instruction in the abstract, but the enhanced rationality and reliability the existence of the instruction introduced into the jury's deliberations. Where no lesser included offense exists, a lesser included offense instruction detracts from, rather than enhances, the rationality of the process. *Beck* does not require that result.

The Court in *Beck* recognized that the jury's role in the criminal process is essentially unreviewable and not always rational. The absence of a lesser included offense instruction increases the risk that the jury will convict, not because it is persuaded that the defendant is guilty of capital murder, but simply to avoid setting the defendant free. In *Beck*, the Court found that risk unacceptable and inconsistent with the reliability this Court has demanded in capital proceedings. *Id.*, at 643. The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence. *Id.*, at 638–643. Requiring that the jury be instructed on lesser included offenses for which the defendant may not be convicted, however,

would simply introduce another type of distortion into the factfinding process.

We reaffirm our commitment to the demands of reliability in decisions involving death and to the defendant's right to the benefit of a lesser included offense instruction that may reduce the risk of unwarranted capital convictions. But we are unwilling to close our eyes to the social cost of petitioner's proposed rule. *Beck* does not require that the jury be tricked into believing that it has a choice of crimes for which to find the defendant guilty, if in reality there is no choice. Such a rule not only would undermine the public's confidence in the criminal justice system, but it also would do a serious disservice to the goal of rationality on which the *Beck* rule is based.

If the jury is not to be tricked into thinking that there is a range of offenses for which the defendant may be held accountable, then the question is whether *Beck* requires that a lesser included offense instruction be given, with the defendant being forced to waive the expired statute of limitations on those offenses, or whether the defendant should be given a choice between having the benefit of the lesser included offense instruction or asserting the statute of limitations on the lesser included offenses. We think the better option is that the defendant be given the choice.

As the Court in *Beck* recognized, the rule regarding a lesser included offense instruction originally developed as an aid to the prosecution. If the State failed to produce sufficient evidence to prove the crime charged, it might still persuade the jury that the defendant was guilty of something. *Id.*, at 633. See also 3 C. Wright, Federal Practice and Procedure § 515, p. 20, n. 2 (2d ed. 1982). Although the *Beck* rule rests on the premise that a lesser included offense instruction in a capital case is of benefit to the defendant, there may well be cases in which the defendant will be confident enough that the State has not proved capital murder that he will want to take his chances with the jury. If so, we see

little reason to require him not only to waive his statute of limitations defense, but also to give the State what he perceives as an advantage—an opportunity to convict him of a lesser offense if it fails to persuade the jury that he is guilty of capital murder. In this case, petitioner was given a choice whether to waive the statute of limitations on the lesser offenses included in capital murder. He knowingly chose not to do so.[6] Under those circumstances, it was not error for the trial judge to refuse to instruct the jury on the lesser included offenses.

## III

Petitioner's second challenge concerns the trial judge's imposition of a sentence of death after the jury had recommended life imprisonment. Petitioner urges that allowing a judge to override a jury's recommendation of life violates the Eighth Amendment's proscription against "cruel and unusual punishments." Because the jury's verdict of life should be final, petitioner argues, the practice also violates the Fifth

---

[6] There is no doubt about petitioner's understanding of the implications of his refusal to waive the statute of limitations. The following colloquy occurred in open court:

"THE COURT: Do you understand that while the statute of limitations has run on the Court submitting to the jury lesser included verdicts representing the charges of second-degree murder and third-degree murder, manslaughter, that you who has the benefit of the statute of limitations can waive that benefit and, of course—and then have the Court submit the case to the jury on the first-degree, second-degree, third-degree and manslaughter.

"If you don't waive the statute of limitations, then the Court would submit to the jury only on the one charge, the main charge, which is murder in the first degree, and the sentencing alternatives are as [defense counsel] stated them. Do you understand that?

"MR. SPAZIANO: Yes, your Honor.

"THE COURT: Are you sure?

"MR. SPAZIANO: I understand what I'm waiving. I was brought here on first-degree murder, and I figure if I'm guilty of this, I should be killed." Tr. 753–754.

458

Amendment's Double Jeopardy Clause made applicable to the States through the Fourteenth Amendment. See *Benton* v. *Maryland*, 395 U. S. 784, 793–796 (1969). Finally, drawing on this Court's recognition of the value of the jury's role, particularly in a capital proceeding, petitioner urges that the practice violates the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.

Petitioner points out that we need not decide whether jury sentencing in all capital cases is required; this case presents only the question whether, given a jury verdict of life, the judge may override that verdict and impose death. As counsel acknowledged at oral argument, however, his fundamental premise is that the capital sentencing decision is one that, in all cases, should be made by a jury. Tr. of Oral Arg. 16–17. We therefore address that fundamental premise. Before doing so, however, it is useful to clarify what is not at issue here.

Petitioner does not urge that capital sentencing is so much like a trial on guilt or innocence that it is controlled by the Court's decision in *Duncan* v. *Louisiana*, 391 U. S. 145 (1968). In *Duncan*, the Court found that the right to jury trial guaranteed by the Sixth Amendment is so " 'basic in our system of jurisprudence,' " *id.*, at 149, quoting *In re Oliver*, 333 U. S. 257, 273 (1948), that it is also protected against state action by the Fourteenth Amendment.

This Court, of course, has recognized that a capital proceeding in many respects resembles a trial on the issue of guilt or innocence. See *Bullington* v. *Missouri*, 451 U. S. 430, 444 (1981). Because the " 'embarrassment, expense and ordeal' . . . faced by a defendant at the penalty phase of a . . . capital murder trial . . . are at least equivalent to that faced by any defendant at the guilt phase of a criminal trial," the Court has concluded that the Double Jeopardy Clause bars the State from making repeated efforts to persuade a sentencer to impose the death penalty. *Id.*, at 445, quoting *Green* v. *United States*, 355 U. S. 184, 187 (1957); *Arizona* v.

*Rumsey*, 467 U. S. 203 (1984). The fact that a capital sentencing is like a trial in the respects significant to the Double Jeopardy Clause, however, does not mean that it is like a trial in respects significant to the Sixth Amendment's guarantee of a jury trial. The Court's concern in *Bullington* was with the risk that the State, with all its resources, would wear a defendant down, thereby leading to an erroneously imposed death penalty. 451 U. S., at 445. There is no similar danger involved in denying a defendant a jury trial on the sentencing issue of life or death. The sentencer, whether judge or jury, has a constitutional obligation to evaluate the unique circumstances of the individual defendant and the sentencer's decision for life is final. *Arizona* v. *Rumsey*, *supra*. More important, despite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding—a determination of the appropriate punishment to be imposed on an individual. See *Lockett* v. *Ohio*, 438 U. S. 586, 604–605 (1978) (plurality opinion); *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976) (plurality opinion), citing *Pennsylvania ex rel. Sullivan* v. *Ashe*, 302 U. S. 51, 55 (1937), and *Williams* v. *New York*, 337 U. S. 241, 247–249 (1949). The Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue.

Nor does petitioner urge that this Court's recognition of the "qualitative difference" of the death penalty requires the benefit of a jury. In *Furman* v. *Georgia*, 408 U. S., at 238, the Court struck down the then-existing capital sentencing statutes of Georgia and Texas, in large part because of its conclusion that, under those statutes, the penalty was applied arbitrarily and discriminatorily. See also *Gregg* v. *Georgia*, 428 U. S. 153, 188 (1976) (joint opinion of Stewart, POWELL, and STEVENS, JJ.). Since then, the Court has emphasized its pursuit of the "twin objectives" of "measured, consistent application and fairness to the accused." *Eddings*

v. *Oklahoma*, 455 U. S. 104, 110–111 (1982).[7]   If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not.   *Zant* v. *Stephens*, 462 U. S. 862, 873–880 (1983); *Furman* v. *Georgia*, 408 U. S., at 294 (BRENNAN, J., concurring).   It must also allow the sentencer to consider the individual circumstances of the defendant, his background, and his crime.   *Lockett* v. *Ohio, supra.*

Nothing in those twin objectives suggests that the sentence must or should be imposed by a jury.   While it is to be hoped that current procedures have greatly reduced the risk that jury sentencing will result in arbitrary or discriminatory application of the death penalty, see *Gregg* v. *Georgia*, 428 U. S., at 190–195 (joint opinion), there certainly is nothing in the safeguards necessitated by the Court's recognition of the qualitative difference of the death penalty that *requires* that the sentence be imposed by a jury.

---

[7] Because the death sentence is unique in its severity and in its irrevocability, *Gregg* v. *Georgia*, 428 U. S. 153, 187 (1976) (joint opinion of Stewart, POWELL, and STEVENS, JJ.); *Furman* v. *Georgia*, 408 U. S. 238, 286–291 (1972) (BRENNAN, J., concurring), the Court has carefully scrutinized the States' capital sentencing schemes to minimize the risk that the penalty will be imposed in error or in an arbitrary and capricious manner. There must be a valid penological reason for choosing from among the many criminal defendants the few who are sentenced to death.   *Zant* v. *Stephens*, 462 U. S. 862, 876–877 (1983); *Enmund* v. *Florida*, 458 U. S. 782, 788–789 (1982); *Godfrey* v. *Georgia*, 446 U. S. 420, 428–429 (1980); *Gardner* v. *Florida*, 430 U. S. 349, 360–361 (1977) (plurality opinion); *Proffitt* v. *Florida*, 428 U. S. 242, 254–260 (1976) (joint opinion of Stewart, POWELL, and STEVENS, JJ.); *Gregg* v. *Georgia*, 428 U. S., at 196–207; *Furman* v. *Georgia, supra.*   At the same time, the Court has insisted that the sentencing decision be based on the facts and circumstances of the individual and his crime.   *Zant* v. *Stephens*, 462 U. S., at 879; *Eddings* v. *Oklahoma*, 455 U. S., at 110–112; *Lockett* v. *Ohio*, 438 U. S. 586, 601–605 (1978) (plurality opinion); *Gregg* v. *Georgia*, 428 U. S., at 197; *Woodson* v. *North Carolina*, 428 U. S. 280, 303–304 (1976) (plurality opinion).

Petitioner's primary argument is that the laws and practice in most of the States indicate a nearly unanimous recognition that juries, not judges, are better equipped to make reliable capital sentencing decisions and that a jury's decision for life should be inviolate. The reason for that recognition, petitioner urges, is that the nature of the decision whether a defendant should live or die sets capital sentencing apart and requires that a jury have the ultimate word. Noncapital sentences are imposed for various reasons, including rehabilitation, incapacitation, and deterrence. In contrast, the primary justification for the death penalty is retribution. As has been recognized, "the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death." *Id.*, at 184. The imposition of the death penalty, in other words, is an expression of community outrage. Since the jury serves as the voice of the community, the jury is in the best position to decide whether a particular crime is so heinous that the community's response must be death. If the answer is no, that decision should be final.

Petitioner's argument obviously has some appeal. But it has two fundamental flaws. First, the distinctions between capital and noncapital sentences are not so clear as petitioner suggests. Petitioner acknowledges, for example, that deterrence may be a justification for capital as well as for noncapital sentences. He suggests only that deterrence is not a proper consideration for particular sentencers who are deciding whether the penalty should be imposed in a given case. The same is true, however, in noncapital cases. Whatever the sentence, its deterrent function is primarily a consideration for the legislature. *Gregg* v. *Georgia*, 428 U. S., at 186 (joint opinion). Similar points can be made about the other purposes of capital and noncapital punishment. Although incapacitation has never been embraced as a sufficient justification for the death penalty, it is a legitimate consideration

in a capital sentencing proceeding. *Id.*, at 183, n. 28; *Jurek* v. *Texas*, 428 U. S. 262 (1976) (joint opinion of Stewart, POWELL, and STEVENS, JJ.). While retribution clearly plays a more prominent role in a capital case, retribution is an element of all punishments society imposes, and there is no suggestion as to any of these that the sentence may not be imposed by a judge.

Second, even accepting petitioner's premise that the retributive purpose behind the death penalty is the element that sets the penalty apart, it does not follow that the sentence must be imposed by a jury. Imposing the sentence in individual cases is not the sole or even the primary vehicle through which the community's voice can be expressed. This Court's decisions indicate that the discretion of the sentencing authority, whether judge or jury, must be limited and reviewable. See, *e. g.*, *Gregg* v. *Georgia, supra; Woodson* v. *North Carolina*, 428 U. S., at 302–303; *Zant* v. *Stephens*, 462 U. S., at 879–880. The sentencer is responsible for weighing the specific aggravating and mitigating circumstances the legislature has determined are necessary touchstones in determining whether death is the appropriate penalty. Thus, even if it is a jury that imposes the sentence, the "community's voice" is not given free rein. The community's voice is heard at least as clearly in the legislature when the death penalty is authorized and the particular circumstances in which death is appropriate are defined. See *Gregg* v. *Georgia*, 428 U. S., at 183–184 (joint opinion); *Furman* v. *Georgia*, 408 U. S., at 394–395 (BURGER, C. J., dissenting); *id.*, at 452–454 (POWELL, J., dissenting).

We do not denigrate the significance of the jury's role as a link between the community and the penal system and as a bulwark between the accused and the State. See *Gregg* v. *Georgia*, 428 U. S., at 181 (joint opinion); *Williams* v. *Florida*, 399 U. S. 78, 100 (1970); *Duncan* v. *Louisiana*, 391 U. S., at 156; *Witherspoon* v. *Illinois*, 391 U. S. 510, 519, n. 15 (1968). The point is simply that the purpose of the

death penalty is not frustrated by, or inconsistent with, a scheme in which the imposition of the penalty in individual cases is determined by a judge.[8]

We also acknowledge the presence of the majority view that capital sentencing, unlike other sentencing, should be performed by a jury. As petitioner points out, 30 out of 37 jurisdictions with a capital sentencing statute give the life-or-death decision to the jury, with only 3 of the remaining 7 allowing a judge to override a jury's recommendation of life.[9]

---

[8] Petitioner's efforts to distinguish the considerations relevant to imposition of a capital or a noncapital sentence bear more on the jury's ability to function as the sentencer in a capital case than on the constitutionality of the judge's doing so. We have no particular quarrel with the proposition that juries, perhaps, are more capable of making the life-or-death decision in a capital case than of choosing among the various sentencing options available in a noncapital case. See ABA Standards for Criminal Justice 18–1.1, Commentary, pp. 18·21–18·22 (2d ed. 1980) (reserving capital sentencing from general disapproval of jury involvement in sentencing). Sentencing by the trial judge certainly is not required by *Furman* v. *Georgia*, *supra*. See *Gregg* v. *Georgia*, 428 U. S., at 188–195 (joint opinion). What we do not accept is that, because juries may sentence, they constitutionally must do so.

[9] Twenty-nine jurisdictions allow a death sentence only if the jury recommends death, unless the defendant has requested trial or sentencing by the court. See Ark. Stat. Ann. § 41–1301 (1977); Cal. Penal Code Ann. § 190.3 (West Supp. 1984); Colo. Rev. Stat. § 16–11–103 (1978 and Supp. 1983); Conn. Gen. Stat. § 53a–46a (1983); Del. Code Ann., Tit. 11, § 11–4209 (1979 and Supp. 1982); Ga. Code Ann. §§ 17–10–30 to 17–10–32 (1982); Ill. Rev. Stat., ch. 38, ¶ 9–1 (Supp. 1984); Ky. Rev. Stat. § 532.025(1)(b) (Supp. 1982); La. Code Crim. Proc. Ann., Art. 905.8 (West Supp. 1984); Md. Ann. Code, Art. 27, § 413 (Supp. 1983); Mass. Gen. Laws Ann., ch. 279, §§ 68, 70 (West Supp. 1984); Miss. Code Ann. § 99–19–101 (Supp. 1983); Mo. Rev. Stat. § 565.006 (Supp. 1982); N. H. Rev. Stat. Ann. § 630.5 (Supp. 1983); N. J. Stat. Ann. § 2C:11–3(c) (West 1982); N. M. Stat. Ann. § 31–20A–3 (1981); N. C. Gen. Stat. § 15A–2000 (1983); Ohio Rev. Code Ann. § 2929.03 (1982); Okla. Stat., Tit. 21, § 701.11 (1981); 42 Pa. Cons. Stat. § 9711(f) (1982); S. C. Code § 16–3–20 (Supp. 1983); S. D. Comp. Laws Ann. § 23A–27A–4 (1979); Tenn. Code Ann. § 39–2–203 (1982); Tex. Code Crim. Proc. Ann., Art. 37.071 (Vernon 1981 and Supp. 1984); Utah Code Ann. § 76–3–207 (Supp. 1983); Va. Code § 19.2–264.4 (1983); Wash. Rev. Code

464

The fact that a majority of jurisdictions have adopted a different practice, however, does not establish that contemporary standards of decency are offended by the jury override. The Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws. "Although the judgments of legislatures, juries, and prosecutors weigh heavily in the balance, it is for us ultimately to judge whether the Eighth Amendment" is violated by a challenged practice. See *Enmund* v. *Florida*, 458 U. S. 782, 797 (1982); *Coker* v. *Georgia*, 433 U. S. 584, 597 (1977) (plurality opinion). In light of the facts that the Sixth Amendment does not require jury sentencing, that the demands of fairness and reliability in capital cases do not require it, and that neither the nature of, nor the purpose behind, the death penalty requires jury sentencing, we cannot conclude that placing responsibility on the trial judge to impose the sentence in a capital case is unconstitutional.

As the Court several times has made clear, we are unwilling to say that there is any one right way for a State to set up its capital sentencing scheme. See *Pulley* v. *Harris*, 465 U. S. 37 (1984); *Zant* v. *Stephens*, 462 U. S., at 884; *Gregg* v. *Georgia*, 428 U. S., at 195 (joint opinion). The Court twice has concluded that Florida has struck a reasonable balance between sensitivity to the individual and his circumstances and ensuring that the penalty is not imposed arbitrarily or discriminatorily. *Barclay* v. *Florida*, 463

---

§ 10.95.030 (1983); Wyo. Stat. § 6–2–102 (1983); 49 U. S. C. App. § 1473(c). In Nevada, the jury is given responsibility for imposing the sentence in a capital case, but if the jury cannot agree, a panel of three judges may impose the sentence. Nev. Rev. Stat. §§ 175.554, 175.556 (1981). In Arizona, Idaho, Montana, and Nebraska, the court alone imposes the sentence. Ariz. Rev. Stat. Ann. § 13–703 (Supp. 1983–1984); Idaho Code § 19–2515 (1979); Mont. Code Ann. § 46–18–301 (1983); Neb. Rev. Stat. § 29–2520 (1979). Besides Florida, the only States that allow a judge to override a jury's recommendation of life are Alabama and Indiana. Ala. Code § 13A–5–46 (1982); Ind. Code § 35–50–2–9 (Supp. 1984).

U. S. 939 (1983); *Proffitt* v. *Florida,* 428 U. S. 242, 252 (1976) (joint opinion of Stewart, POWELL, and STEVENS, JJ.). We are not persuaded that placing the responsibility on a trial judge to impose the sentence in a capital case is so fundamentally at odds with contemporary standards of fairness and decency that Florida must be required to alter its scheme and give final authority to the jury to make the life-or-death decision.

## IV

Our determination that there is no constitutional imperative that a jury have the responsibility of deciding whether the death penalty should be imposed also disposes of petitioner's double jeopardy challenge to the jury-override procedure. If a judge may be vested with sole responsibility for imposing the penalty, then there is nothing constitutionally wrong with the judge's exercising that responsibility after receiving the advice of the jury. The advice does not become a judgment simply because it comes from the jury.

## V

Petitioner's final challenge is to the application of the standard the Florida Supreme Court has announced for allowing a trial court to override a jury's recommendation of life. See *Tedder* v. *State,* 322 So. 2d 908, 910 (1975). This Court already has recognized the significant safeguard the *Tedder* standard affords a capital defendant in Florida. See *Dobbert* v. *Florida,* 432 U. S. 282, 294–295 (1977). See also *Proffitt,* 428 U. S., at 249 (joint opinion). We are satisfied that the Florida Supreme Court takes that standard seriously and has not hesitated to reverse a trial court if it derogates the jury's role. See *Richardson* v. *State,* 437 So. 2d 1091, 1095 (Fla. 1983); *Miller* v. *State,* 332 So. 2d 65 (Fla. 1976). Our responsibility, however, is not to second-guess the deference accorded the jury's recommendation in a particular case, but to ensure that the result of the process is not arbitrary or discriminatory.

We see nothing that suggests that the application of the jury-override procedure has resulted in arbitrary or discriminatory application of the death penalty, either in general or in this particular case. Regardless of the jury's recommendation, the trial judge is required to conduct an independent review of the evidence and to make his own findings regarding aggravating and mitigating circumstances. If the judge imposes a sentence of death, he must set forth in writing the findings on which the sentence is based. Fla. Stat. § 921.141(3) (1983). The Florida Supreme Court must review every capital sentence to ensure that the penalty has not been imposed arbitrarily or capriciously. § 921.141(4). As JUSTICE STEVENS noted in *Barclay*, there is no evidence that the Florida Supreme Court has failed in its responsibility to perform meaningful appellate review of each death sentence, either in cases in which both the jury and the trial court have concluded that death is the appropriate penalty or in cases when the jury has recommended life and the trial court has overridden the jury's recommendation and sentenced the defendant to death. See *Barclay* v. *Florida*, 463 U. S., at 971–972, and n. 23 (opinion concurring in judgment).

In this case, the trial judge based his decision on the presence of two statutory aggravating circumstances. The first, that the defendant had previously been convicted of another capital felony or of a felony involving the use or threat of violence to the person, § 921.141(5), was based on evidence not available to the advisory jury but, under Florida law, was properly considered by the trial judge. See *White* v. *State*, 403 So. 2d 331, 339–340 (1981). Petitioner's prior conviction was for rape and aggravated battery. The trial judge also found that the murder in this case was heinous, atrocious, and cruel. The witness who accompanied petitioner to the dump site where the victim's body was found testified that the body was covered with blood and that there were cuts on the breasts, stomach, and chest. The witness also testified that petitioner had recounted his torture of the victim while

she was still living.   The trial judge found no mitigating circumstances.

The Florida Supreme Court reviewed petitioner's sentence and concluded that the death penalty was properly imposed under state law.   It is not our function to decide whether we agree with the majority of the advisory jury or with the trial judge and the Florida Supreme Court.   See *Barclay* v. *Florida*, 463 U. S., at 968 (STEVENS, J., concurring in judgment).   Whether or not "reasonable people" could differ over the result here, we see nothing irrational or arbitrary about the imposition of the death penalty in this case.

The judgment of the Supreme Court of Florida is affirmed.

*It is so ordered.*

JUSTICE WHITE, with whom JUSTICE REHNQUIST joins, concurring in part and concurring in the judgment.

I join the Court's opinion and judgment except for the dictum on page 456 of the opinion indicating that *Beck* v. *Alabama*, 447 U. S. 625 (1980), requires a state court in the trial of a capital case to permit the defendant to waive the statute of limitations and to give a lesser-included-offense instruction as to an offense that would otherwise be barred.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring in part and dissenting in part.

In this case, as in 82 others arising under the capital punishment statute enacted by Florida in 1972, the trial judge sentenced the defendant to death after a jury had recommended a sentence of life imprisonment.   The question presented is whether the Constitution of the United States permits petitioner's execution when the prosecution has been unable to persuade a jury of his peers that the death penalty is the appropriate punishment for his crime.

The Fourteenth Amendment provides that no State may "deprive any person of life, liberty, or property without due

process of law." The concept of due process permits no such deprivation—whether of life, liberty, or property—to occur if it is grossly excessive in the particular case—if it is "cruel and unusual punishment" proscribed by the Eighth Amendment.[1] The differences between the three categories, however, are not mere matters of degree. For although we look to state law as the source of the right to property, "it is not the source of liberty, and surely not the exclusive source." *Meachum* v. *Fano*, 427 U. S. 215, 230 (1976) (STEVENS, J., dissenting). See *Board of Regents* v. *Roth*, 408 U. S. 564, 572, 577 (1972). Because a deprivation of liberty is qualitatively different from a deprivation of property, heightened procedural safeguards are a hallmark of Anglo-American criminal jurisprudence. But that jurisprudence has also unequivocally established that a State's deprivation of a person's life is also qualitatively different from any lesser intrusion on liberty.

In the 12 years since *Furman* v. *Georgia*, 408 U. S. 238 (1972), every Member of this Court has written or joined at least one opinion endorsing the proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment, and hence must be accompanied by unique safeguards to ensure that it is a justified response to a given offense.[2] Because it is the one pun-

---

[1] See *Solem* v. *Helm*, 463 U. S. 277, 288–290 (1983). The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Eighth Amendment is incorporated in the Due Process Clause of the Fourteenth Amendment. *E. g.*, *Robinson* v. *California*, 370 U. S. 660, 666 (1962); *Louisiana ex rel. Francis* v. *Resweber*, 329 U. S. 459, 463 (1947) (plurality opinion).

[2] See *Solem* v. *Helm*, 463 U. S., at 289; *id.*, at 306 (BURGER, C. J., dissenting); *Enmund* v. *Florida*, 458 U. S. 782, 797 (1982); *Beck* v. *Alabama*, 447 U. S. 625, 637–638 (1980); *Rummel* v. *Estelle*, 445 U. S. 263, 272 (1980); *Lockett* v. *Ohio*, 438 U. S. 586, 604–605 (1978) (plurality opinion); *Coker* v. *Georgia*, 433 U. S. 584, 598 (1977) (plurality opinion);

ishment that cannot be prescribed by a rule of law as judges normally understand such rules, but rather is ultimately understood only as an expression of the community's outrage— its sense that an individual has lost his moral entitlement to live[3]—I am convinced that the danger of an excessive response can only be avoided if the decision to impose the death penalty is made by a jury rather than by a single governmental official. This conviction is consistent with the judg-

---

*Gardner* v. *Florida,* 430 U. S. 349, 357–358 (1977) (plurality opinion); *Gregg* v. *Georgia,* 428 U. S. 153, 188 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.).

[3] "Death is truly an awesome punishment. The calculated killing of a human being by the State involves, by its very nature, a denial of the executed person's humanity. The contrast with the plight of a person punished by imprisonment is evident. An individual in prison does not lose 'the right to have rights.' A prisoner retains, for example, the constitutional rights to the free exercise of religion, to be free of cruel and unusual punishments, and to treatment as a 'person' for purposes of due process of law and the equal protection of the laws. A prisoner remains a member of the human family. Moreover, he retains the right of access to the courts. His punishment is not irrevocable. Apart from the common charge, grounded upon the recognition of human fallibility, that the punishment of death must inevitably be inflicted upon innocent men, we know that death has been the lot of men whose convictions were unconstitutionally secured in view of later, retroactively applied, holdings of this Court. The punishment itself may have been unconstitutionally inflicted, yet the finality of death precludes relief. An executed person has indeed 'lost the right to have rights.' As one 19th century proponent of punishing criminals by death declared, 'When a man is hung, there is an end of our relations with him. His execution is a way of saying, "You are not fit for this world, take your chance elsewhere."'" *Furman,* 408 U. S., at 290 (BRENNAN, J., concurring) (citation omitted) (quoting Stephen, Capital Punishments, 69 Fraser's Magazine 753, 763 (1864)). See also 408 U. S., at 306 (Stewart, J., concurring) ("The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity").

ment of history and the current consensus of opinion that juries are better equipped than judges to make capital sentencing decisions. The basic explanation for that consensus lies in the fact that the question whether a sentence of death is excessive in the particular circumstances of any case is one that must be answered by the decisionmaker that is best able to "express the conscience of the community on the ultimate question of life or death." *Witherspoon* v. *Illinois*, 391 U. S. 510, 519 (1968) (footnote omitted).

## I

Florida has adopted an unusual "trifurcated" procedure for identifying the persons convicted of a capital felony who shall be sentenced to death. It consists of a determination of guilt or innocence by the jury, an advisory sentence by the jury, and an actual sentence imposed by the trial judge. *Proffitt* v. *Florida*, 428 U. S. 242, 248–250 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.).[4] The judge's determination is then reviewed by the Florida Supreme Court to determine whether the aggravating and mitigating circumstances found

---

[4] The Court correctly treats the question whether this procedure is constitutional as an open one. The question has been explicitly reserved for decision by the Court in the past. See *Bell* v. *Ohio*, 438 U. S. 637, 642–643, n. (1978) (plurality opinion); *Lockett* v. *Ohio*, 438 U. S., at 609, n. 16 (plurality opinion). In *Proffitt*, in which we considered a number of aspects of this statute, this precise issue did not arise since the advisory jury had recommended that Proffitt be sentenced to death. 428 U. S., at 246 (opinion of Stewart, POWELL, and STEVENS, JJ.). Thus, my description of *Proffitt* as containing a holding on this point in *Barclay* v. *Florida*, 463 U. S. 939, 971 (1983) (STEVENS, J., concurring in judgment), was incorrect. Death sentences based on the trial judge's rejection of a jury's recommendation were vacated without considering this question in *Gardner* v. *Florida*, 430 U. S. 349 (1977), and *Arizona* v. *Rumsey*, 467 U. S. 203 (1984). A death sentence in a case in which the advisory jury had recommended life imprisonment was upheld in *Dobbert* v. *Florida*, 432 U. S. 282 (1977), but there certiorari was granted only to consider the permissibility of the sentence under the *Ex Post Facto* Clause, see *id.*, at 284. Such a sentence was also upheld in *Barclay*, but this issue was neither raised nor decided.

by the trial judge are supported by the evidence and justify a sentence of death. *Id.*, at 250–251, 253.

Because this procedure was adopted by a democratically elected legislature, "we presume its validity," *Gregg* v. *Georgia*, 428 U. S. 153, 175 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.). Nevertheless, this presumption could not be conclusive, or the Eighth Amendment would be effectively read out of the Constitution. The Eighth Amendment is based on the recognition that there are occasions on which the State or Federal Governments will undertake to punish in a manner inconsistent with a fundamental value that the Framers wished to secure against legislative majorities. Thus, the Court correctly states: "'Although the judgments of legislatures, juries, and prosecutors weigh heavily in the balance, it is ultimately for us to judge whether the Eighth Amendment' is violated by a challenged practice." *Ante*, at 464 (quoting *Enmund* v. *Florida*, 458 U. S. 782, 797 (1982)). Our cases have established the appropriate mode of analysis—there must be "an assessment of contemporary values concerning the infliction of a challenged sanction," to determine whether punishment has been imposed in a way that offends an "evolving standar[d] of decency," *Gregg*, 428 U. S., at 173 (opinion of Stewart, POWELL, and STEVENS, JJ.).[5]

---

[5] See *Enmund* v. *Florida*, 458 U. S., at 813 (O'CONNOR, J., dissenting); *Coker* v. *Georgia*, 433 U. S., at 603–604 (POWELL, J., concurring in judgment in part and dissenting in part); *Woodson* v. *North Carolina*, 428 U. S. 280, 288 (1976) (plurality opinion). There is another aspect to Eighth Amendment analysis unrelated to contemporary standards of decency: "[T]he Eighth Amendment demands more than that a challenged punishment be acceptable to contemporary society. The Court also must ask whether it comports with the basic concept of human dignity at the core of the Amendment. . . . [T]he sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg*, 428 U. S., at 182–183 (opinion of Stewart, POWELL, and STEVENS, JJ.) (citation omitted). See also *Rhodes* v. *Chapman*, 452 U. S. 337, 346 (1981); *Estelle* v. *Gamble*, 429 U. S. 97, 103 (1976). No one contends, however, that judicial sentencing in capital cases results in the gratuitous infliction of suffering so as to violate this aspect of the Eighth Amendment.

## II

Inquiry into the practices adopted by the majority of legislatures provides a logical starting point for determining whether the practice at issue here comports with the Eighth Amendment: "[L]egislative measures adopted by the people's chosen representatives weigh heavily in ascertaining contemporary standards of decency." *Woodson* v. *North Carolina*, 428 U. S. 280, 294–295 (1976) (plurality opinion).[6]

The judgment of the people's representatives firmly supports the conclusion that the jury ought to make the life-or-death decision necessary in capital cases. "Except for four States that entirely abolished capital punishment in the middle of the last century, every American jurisdiction has at some time authorized jury sentencing in capital cases." *McGautha* v. *California*, 402 U. S. 183, 200, n. 11 (1971). For example, of 42 jurisdictions that employed discretionary capital sentencing in 1948, only 3 did not require its imposition through jury determinations which the trial judge could not disregard.[7] At the time of *Furman*, only 2 jurisdictions of the 41 which employed discretionary capital punishment permitted a death sentence to be imposed without the consent of a jury.[8] Currently, as the Court explains, *ante*, at 463, 30 of the 37 jurisdictions with capital punishment statutes require that the decision to impose the death penalty be made with the consent of a jury, and only 3 jurisdictions permit an override of a jury's recommendation of leniency.

---

[6] See also *Solem* v. *Helm*, 463 U. S., at 291–292; *Enmund* v. *Florida*, 458 U. S., at 789–793; *Coker* v. *Georgia*, 433 U. S., at 592–596 (plurality opinion); *Roberts* v. *Louisiana*, 428 U. S. 325, 352–354 (1976) (WHITE, J., dissenting); *Gregg*, 428 U. S., at 179–181 (opinion of Stewart, POWELL, and STEVENS, JJ.).

[7] See *Andres* v. *United States*, 333 U. S. 740, 767–770 (1948) (Frankfurter, J., concurring).

[8] See *Witherspoon* v. *Illinois*, 391 U. S. 510, 525–527, and nn. 2–8 (1968) (opinion of Douglas, J.); Brief for United States as *Amicus Curiae* in *McGautha* v. *California*, O. T. 1970, No. 203, and *Crampton* v. *Ohio*, O. T. 1970, No. 204, pp. 36, 132–137.

In *Enmund* v. *Florida*, 458 U. S. 782 (1982), we relied on the fact that only one-third of the jurisdictions with capital statutes permitted the imposition of the death penalty on a defendant who had not intended the death of his victim as strong support for our conclusion that in such cases the imposition of capital punishment offends contemporary standards of decency and therefore violates the Eighth Amendment. See *id.*, at 792. Here the level of consensus is even greater, thereby demonstrating a strong community feeling that it is only decent and fair to leave the life-or-death decision to the authentic voice of the community—the jury—rather than to a single governmental official. Examination of the historical and contemporary evidence thus unequivocally supports the conclusion reached by the Royal Commission on Capital Punishment three decades ago:

> "For our part, we have no hesitation in agreeing with the many witnesses who considered that, in this country at least, the responsibility of deciding whether a person convicted of murder should be sentenced to death or to a lesser punishment is too heavy a burden to impose on any single individual. The sentence of death differs absolutely, not in degree, from any other sentence; and it would be wholly inconsistent with our traditional approach to such issues to lay on the shoulders of the Judge a responsibility so grave and invidious. It is more in accord with the instinct of our people to entrust to the men and women of the jury a joint responsibility for decisions which will affect the life of the accused." Royal Commission on Capital Punishment, 1949–1953, Report 193–194 (1953).[9]

---

[9] The British experience is particularly relevant since the Eighth Amendment was derived from the Magna Carta and the English Declaration of Rights. See *Solem* v. *Helm*, 463 U. S., at 284–285; *Gregg*, 428 U. S., at 169–170 (opinion of Stewart, POWELL, and STEVENS, JJ.); *Furman* v. *Georgia*, 408 U. S. 238, 316–322 (1972) (MARSHALL, J., concurring); *Trop* v. *Dulles*, 356 U. S. 86, 99–101 (1958) (plurality opinion).

## III

Florida is one of only a few States that permits the imposition of a sentence of death without the consent of a jury. Examination of the reasons for Florida's decision illuminates the extent to which this statute can be considered consistent with contemporary standards of fairness and decency.

During the century between 1872 and 1972 Florida law required the jury to make the capital sentencing decision. The change in the decisionmaking process that occurred in 1972 was not motivated by any identifiable change in the legislature's assessment of community values; rather, it was a response to this Court's decision in *Furman*. In *Furman* a plurality of the Court had condemned the arbitrary pattern of results under the then-existing capital punishment statutes.[10] A number of States responded to *Furman* by reducing the discretion granted to juries not because of some deeply rooted communal value, but rather in an attempt to comply with the several opinions in that case.[11] In *Dobbert* v. *Florida*, 432 U. S. 282 (1977), we specifically noted that the Florida jury override now under challenge was adopted in an attempt to comply with *Furman*, see 432 U. S., at 294–297.[12] We have subsequently made it clear that jury sentencing is not incon-

---

[10] See 408 U. S., at 249–257 (Douglas, J., concurring); *id.*, at 291–295 (BRENNAN, J., concurring); *id.*, at 309–310 (Stewart, J., concurring); *id.*, at 314 (WHITE, J., concurring). See also *id.*, at 364–366 (MARSHALL, J., concurring).

[11] See *Lockett* v. *Ohio*, 438 U. S., at 599–600 (plurality opinion); *Woodson*, 428 U. S., at 298–299 (plurality opinion).

[12] See also Ehrhardt & Levinson, Florida's Legislative Response to Furman: An Exercise in Futility?, 64 J. Crim. L. & C. 10 (1973). In this very case the Florida Supreme Court said that "allowing the jury's recommendation to be binding would violate *Furman*," 433 So. 2d 508, 512 (1983). See also *Johnson* v. *State*, 393 So. 2d 1069, 1074 (Fla.) *(per curiam)*, cert. denied, 454 U. S. 882 (1981); *Douglas* v. *State*, 373 So. 2d 895, 897 (Fla. 1979) *(per curiam)*.

sistent with *Furman*,[13] thereby undermining the basis for the legislative judgment challenged here. A legislative choice that is predicated on this sort of misunderstanding is not entitled to the same presumption of validity as one that rests wholly on a legislative assessment of sound policy and community sentiment.[14]

Even apart from its history, there is reason to question whether the Florida statute can be viewed as representing a judgment that judicial sentencing is consistent with contemporary standards. The administration of the statute actually reflects a deeply rooted impulse to legitimate the process through involvement of the jury. That is made evident not only through the use of an advisory jury,[15] but also by the fact

---

[13] See *Zant* v. *Stephens*, 462 U. S. 862, 874–875 (1983); *Gregg*, 428 U. S., at 190–195 (opinion of Stewart, POWELL, and STEVENS, JJ.); *id.*, at 221–224 (WHITE, J., concurring in judgment).

[14] A separate reason for discounting the normal presumption of validity is that the statute has not worked as intended to protect the rights of the defendant. Although technically only the judge may impose a death sentence, in a practical sense the accused confronts the jeopardy of a death sentence twice. If the jury recommends death, an elected Florida judge sensitive to community sentiment would have an additional reason to follow that recommendation. If there are any cases in which the jury override procedure has worked to the defendant's advantage because the trial judge rejected a jury's recommendation of death, they have not been brought to our attention by the Attorney General of Florida, who would presumably be aware of any such cases. On the other hand, the fact that more persons identify with victims of crime than with capital defendants inevitably encourages judges who must face election to reject a recommendation of leniency. The fact that 83 defendants persuaded juries to recommend mercy but were thereafter sentenced to death under the Florida statute lends support to the thesis that as a practical matter the prosecution is given two chances to obtain a death sentence under the statute.

[15] In all capital cases, even those in which the defendant pleaded guilty or waived a jury on the issue of guilt or innocence, the Florida statute requires the enpanelment of an advisory jury and that it render a sentence unless the advisory jury is separately waived by the defendant. See Fla. Stat. §§ 921.141(1) and (2) (1983).

that the statute has been construed to forbid a trial judge to reject the jury's decision unless he finds that the evidence favoring a sentence of death is so clear and convincing that virtually no reasonable person could impose a lesser sentence.[16] Thus, the Florida experience actually lends support to the conclusion that American jurisprudence has considered the use of the jury to be important to the fairness and legitimacy of capital punishment.

## IV

The Court correctly notes that sentencing has traditionally been a question with which the jury is not concerned. *Ante,* at 459. Deciding upon the appropriate sentence for a person who has been convicted of a crime is the routine work of judges. By reason of this experience, as well as their training, judges presumably perform this function well. But, precisely because the death penalty is unique, the normal presumption that a judge is the appropriate sentencing authority does not apply in the capital context. The decision whether or not an individual must die is not one that has traditionally been entrusted to judges. This tradition, which has marked a sharp distinction between the usual evaluations of judicial competence with respect to capital and noncapital sentencing, not only eliminates the general presumption that judicial sentencing is appropriate in the capital context, but also in itself provides reason to question whether assigning this role to governmental officials and not juries is consistent with the community's moral sense.[17]

---

[16] See *Dobbert,* 432 U. S., at 295–296 (citing *Tedder* v. *State,* 322 So. 2d 908, 910 (Fla. 1975)); *Proffitt* v. *Florida,* 428 U. S. 242, 248–249 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.) (same).

[17] In *Proffitt,* the joint opinion stated: "[I]t would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and is therefore better able to impose sentences similar to those imposed in analogous cases." *Id.,* at 252 (opinion of Stewart, POWELL, and STEVENS, JJ.). Of course, since Proffitt was not challenging judicial sentencing in that case, see n. 4,

While tradition and contemporary practice in most American jurisdictions indicate that capital sentencing by judges offends a moral sense that this unique kind of judgment must be made by a more authentic voice of the community, nevertheless the Court is correct to insist that these factors cannot be conclusive, or the Eighth Amendment would prevent any innovation or variation in the administration of the criminal law. *Ante*, at 464. Therefore, a more focused inquiry into the Eighth Amendment implications of the decision to put an accused to death, and the jury's relationship to those implications, is essential.

## V

Punishment may be "cruel and unusual" because of its barbarity or because it is "excessive" or "disproportionate" to the offense.[18] In order to evaluate a claim that a punishment is excessive, one must first identify the reasons for imposing it. In general, punishment may rationally be imposed for four reasons: (1) to rehabilitate the offender; (2) to incapacitate him from committing offenses in the future; (3) to deter

---

*supra*, this statement was directed only at the risk of arbitrariness that had been identified by the plurality in *Furman*, and was not concerned with the claim made here that jury sentencing is more consistent with community values. Moreover, experience under the Florida statute indicates that this prediction concerning judicial sentencing has not been borne out. Not only has the Florida Supreme Court proved much more likely to reverse in a jury override case than in any other type of capital case, see Radelet & Vandiver, The Florida Supreme Court and Death Penalty Appeals, 74 J. Crim. L. & C. 913 (1983), but also the clear majority of override cases ultimately result in sentences of life imprisonment rather than death. See App. B to Brief for Petitioner. Thus, it is doubtful that judicial sentencing has worked to reduce the level of capital sentencing disparity; if anything, the evidence in override cases suggests that the jury reaches the appropriate result more often than does the judge.

[18] See *Solem* v. *Helm*, 463 U. S., at 284; *Enmund*, 458 U. S., at 788; *Rhodes* v. *Chapman*, 452 U. S., at 346; *Coker* v. *Georgia*, 433 U. S., at 591–592 (plurality opinion); *Estelle* v. *Gamble*, 429 U. S., at 102–103; *Gregg*, 428 U. S., at 171–173 (opinion of Stewart, POWELL, and STEVENS, JJ.); *Weems* v. *United States*, 217 U. S. 349, 371 (1910).

others from committing offenses; or (4) to assuage the victim's or the community's desire for revenge or retribution. The first of these purposes is obviously inapplicable to the death sentence. The second would be served by execution, but in view of the availability of imprisonment as an alternative means of preventing the defendant from violating the law in the future, the death sentence would clearly be an excessive response to this concern.[19] We are thus left with deterrence and retribution as the justifications for capital punishment.[20]

A majority of the Court has concluded that the general deterrence rationale adequately justifies the imposition of capital punishment at least for certain classes of offenses for which the legislature may reasonably conclude that the death penalty has a deterrent effect. However, in reaching this conclusion we have stated that this is a judgment peculiarly within the competence of legislatures and not the judiciary.[21]

---

[19] Although incapacitation was identified as one rationale that had been advanced for the death penalty in *Gregg*, 428 U. S., at 183, n. 28 (opinion of Stewart, POWELL, and STEVENS, JJ.), we placed no reliance upon this rationale in upholding the imposition of capital punishment under the Eighth Amendment, and this ground was not mentioned at all by four of the seven Justices who voted to uphold the death penalty in *Gregg* and its companion cases, see *Roberts* v. *Louisiana*, 428 U. S., at 350–356 (WHITE, J., dissenting, joined by BURGER, C. J., and BLACKMUN and REHNQUIST, JJ.). In any event, incapacitation alone could not justify the imposition of capital punishment, for if it did mandatory death penalty statutes would be constitutional, and, as we have held, they are not. See *ante*, at 461–462.

[20] See *Roberts* v. *Louisiana*, 428 U. S., at 354–355 (WHITE, J., dissenting); *Gregg*, 428 U. S., at 183–186 (opinion of Stewart, POWELL, and STEVENS, JJ.). See also *id.*, at 233 (MARSHALL, J., dissenting).

[21] In *Gregg*, Justice Stewart, JUSTICE POWELL, and I wrote:

"Although some of the studies suggest that the death penalty may not function as a significantly greater deterrent than lesser penalties, there is no convincing empirical evidence either supporting or refuting this view. We may nevertheless assume safely that there are murderers, such as those who act in passion, for whom the threat of death has little or no deterrent effect. But for many others, the death penalty undoubtedly is a significant deterrent. There are carefully contemplated murders, such as

Thus, the deterrence rationale cannot be used to support the use of judicial as opposed to jury discretion in capital sentencing, at least absent some finding, which the Florida Legislature has not purported to make, that judges are better at gauging the general deterrent effect of a capital sentence than are juries.

Moreover, the deterrence rationale in itself argues only for ensuring that the death sentence be imposed in a significant number of cases and remain as a potential social response to the defined conduct. Since the decision whether to employ jury sentencing does not change the number of cases for which death is a possible punishment, the use of judicial sentencing cannot have sufficient impact on the deterrent effect of the statute to justify its use;[22] a murderer's calculus will not be affected by whether the death penalty is imposed by a judge or jury.[23]

---

murder for hire, where the possible penalty of death may well enter into the cold calculus that precedes the decision to act. And there are some categories of murder, such as murder by a life prisoner, where other sanctions may not be adequate.

"The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts. Indeed, many of the post-*Furman* statutes reflect just such a responsible effort to define those crimes and those criminals for which capital punishment is most probably an effective deterrent." *Id.*, at 185–186 (footnotes and citation omitted).

See also *Roberts* v. *Louisiana*, 428 U. S., at 354–355 (WHITE, J., dissenting). The Court takes this same approach today, *ante*, at 461.

[22] Cf. *Enmund*, 458 U. S., at 798–800 (imposition of death penalty on those lacking an intent to kill has too attenuated a deterrent effect to be justified by deterrence); *Lockett* v. *Ohio*, 438 U. S., at 625 (WHITE, J., concurring in part and dissenting in part) (same).

[23] The Florida Legislature did not purport to make a contrary finding, nor does the Court advance an enhanced deterrent effect as a justification for judicial sentencing. Indeed, such an argument would be especially anomalous in this case in light of the deference generally given jury determinations under the Florida statute.

Finally, even though the deterrence rationale may provide a basis for identifying the defendants eligible for the death penalty, our cases establish that the decision whether to condemn a man to death in a given case may not be the product of deterrence considerations alone. Despite the fact that a legislature may rationally conclude that mandatory capital punishment will have a deterrent effect for a given class of aggravated crimes significantly greater than would discretionary capital sentencing, we have invalidated mandatory capital punishment statutes, as well as statutes that do not permit the trier of fact to consider any mitigating circumstance, even if unrelated to or perhaps inconsistent with the deterrent purposes of the penalty. It is now well settled that the trier of fact in a capital case must be permitted to weigh any consideration—indeed any aspect of the defendant's crime or character—relevant to the question whether death is an excessive punishment for the offense.[24] Thus, particular capital sentencing decisions cannot rest entirely on deterrent considerations.

In the context of capital felony cases, therefore, the question whether the death sentence is an appropriate, non-excessive response to the particular facts of the case will depend on the retribution justification. The nature of that justification was described in *Gregg:*

"In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely

---

[24] See *Eddings* v. *Oklahoma,* 455 U. S. 104 (1982); *Lockett* v. *Ohio,* 438 U. S., at 604–608 (plurality opinion); *Roberts* v. *Louisiana,* 431 U. S. 633 (1977) *(per curiam); Roberts* v. *Louisiana,* 428 U. S., at 333–334 (plurality opinion); *Woodson,* 428 U. S., at 303–305 (plurality opinion); *Jurek* v. *Texas,* 428 U. S. 262, 271–272 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.). See also *California* v. *Ramos,* 463 U. S. 992, 1006 (1983); *Enmund,* 458 U. S., at 798.

on legal processes rather than self-help to vindicate their wrongs." 428 U. S., at 183–184 (opinion of Stewart, POWELL, and STEVENS, JJ.) (footnote omitted).[25]

Thus, in the final analysis, capital punishment rests on not a legal but an ethical judgment—an assessment of what we called in *Enmund* the "moral guilt" of the defendant. 458 U. S., at 800–801. And if the decision that capital punishment is the appropriate sanction in extreme cases is justified because it expresses the community's moral sensibility—its demand that a given affront to humanity requires retribution—it follows, I believe, that a representative cross section of the community must be given the responsibility for making that decision. In no other way can an unjustifiable risk of an excessive response be avoided.

## VI

The authors of our federal and state constitutional guarantees uniformly recognized the special function of the jury in any exercise of plenary power over the life and liberty of the citizen. In our jurisprudence, the jury has always played an essential role in legitimating the system of criminal justice.

> "The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions

[25] See also *Furman*, 408 U. S., at 308 (Stewart, J., concurring); *id.*, at 452–454 (POWELL, J., dissenting).

482

strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence." *Duncan* v. *Louisiana,* 391 U. S. 145, 155–156 (1968) (footnote omitted).[26]

Thus, the jury serves to ensure that the criminal process is not subject to the unchecked assertion of arbitrary governmental power; community participation is "critical to public confidence in the fairness of the criminal justice system." *Taylor* v. *Louisiana,* 419 U. S. 522, 530 (1975).[27]

The same consideration that supports a constitutional entitlement to a trial by a jury rather than a judge at the guilt or innocence stage—the right to have an authentic representative of the community apply its lay perspective to the determination that must precede a deprivation of liberty—applies with special force to the determination that must precede

---

[26] See also *Brown* v. *Louisiana,* 447 U. S. 323, 330 (1980) (plurality opinion); *Burch* v. *Louisiana,* 441 U. S. 130, 135 (1979); *Ballew* v. *Georgia,* 435 U. S. 223, 229–230 (1978) (opinion of BLACKMUN, J.); *Apodaca* v. *Oregon,* 406 U. S. 404, 410 (1972) (plurality opinion); *Williams* v. *Florida,* 399 U. S. 78, 100 (1970).

[27] See also *Humphrey* v. *Cady,* 405 U. S. 504, 509 (1972).

a deprivation of life. In many respects capital sentencing resembles a trial on the question of guilt, involving as it does a prescribed burden of proof of given elements through the adversarial process.[28] But more important than its procedural aspects, the life-or-death decision in capital cases depends upon its link to community values for its moral and constitutional legitimacy. In *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), after observing that "a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death," *id.*, at 519 (footnote omitted), the Court added:

> "[O]ne of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system—a line without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.'" *Id.*, at 519, n. 15 (quoting *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion)).[29]

That the jury is central to the link between capital punishment and the standards of decency contained in the Eighth Amendment is amply demonstrated by history. Under the common law capital punishment was mandatory for all felonies, and even through the last century it was mandatory for large categories of offenses. "[O]ne of the most significant developments in our society's treatment of capital punishment has been the rejection of the common-law practice of inexorably imposing a death sentence upon every person

---

[28] See *Bullington* v. *Missouri*, 451 U. S. 430, 438 (1981). See also *Arizona* v. *Rumsey*, 467 U. S., at 209–210.

[29] Accord, *McGautha* v. *California*, 402 U. S. 183, 201–202 (1971); *Furman*, 408 U. S., at 388–389 (BURGER, C. J., dissenting); *id.*, at 439–441 (POWELL, J., dissenting). See generally Note, The Death Penalty and Federalism: Eighth Amendment Constraints on the Allocation of State Decisionmaking Power, 35 Stan. L. Rev. 787, 810–820 (1983).

convicted of a specified offense." *Woodson,* 428 U. S., at 301 (plurality opinion). The jury played a critical role in this process. Juries refused to convict in cases in which they felt the death penalty to be morally unjustified. This forced the adoption of more enlightened capital punishment statutes that were more in accord with the community's moral sensibilities:

> "At least since the Revolution, American jurors have, with some regularity, disregarded their oaths and refused to convict defendants where a death sentence was the automatic consequence of a guilty verdict. As we have seen, the initial movement to reduce the number of capital offenses and to separate murder into degrees was prompted in part by the reaction of jurors as well as by reformers who objected to the imposition of death as the penalty for any crime. Nineteenth century journalists, statesmen, and jurists repeatedly observed that jurors were often deterred from convicting palpably guilty men of first-degree murder under mandatory statutes. Thereafter, continuing evidence of jury reluctance to convict persons of capital offenses in mandatory death penalty jurisdictions resulted in legislative authorization of discretionary jury sentencing . . . ." *Id.,* at 293 (footnote omitted).[30]

Thus the lesson history teaches is that the jury—and in particular jury sentencing—has played a critical role in ensuring that capital punishment is imposed in a manner consistent with evolving standards of decency. This is a lesson of constitutional magnitude, and one that was forgotten during the enactment of the Florida statute.

---

[30] See also *Eddings* v. *Oklahoma,* 455 U. S., at 110–111; *Lockett* v. *Ohio,* 438 U. S., at 597–598 (plurality opinion); *Furman,* 408 U. S., at 245–247 (Douglas, J., concurring); *id.,* at 297–299 (BRENNAN, J., concurring); *id.,* at 339 (MARSHALL, J., concurring); *McGautha,* 402 U. S., at 197–202; *Andres* v. *United States,* 333 U. S., at 753 (Frankfurter, J., concurring).

## VII

The importance of the jury to the legitimacy of the capital sentencing decision has been a consistent theme in our evaluation of post-*Furman* capital punishment statutes. In *Gregg*, we reaffirmed the link between evolving standards of decency and the imposition of capital punishment provided by the jury, as well as the traditional function of the jury in ensuring that the death penalty is assessed only in cases where its imposition is consistent with Eighth Amendment standards:

> "The jury also is a significant and reliable objective index of contemporary values because it is so directly involved. The Court has said that 'one of the most important functions any jury can perform in making . . . a selection [between life imprisonment and death for a defendant convicted in a capital case] is to maintain a link between contemporary community values and the penal system.' It may be true that evolving standards have influenced juries in recent decades to be more discriminating in imposing the sentence of death. But the relative infrequency of jury verdicts imposing the death sentence does not indicate rejection of capital punishment *per se*. Rather, the reluctance of juries in many cases to impose the sentence may well reflect the humane feeling that this most irrevocable of sanctions should be reserved for a small number of extreme cases." 428 U. S., at 181–182 (opinion of Stewart, POWELL, and STEVENS, JJ.) (footnote and citations omitted) (quoting *Witherspoon*, 391 U. S., at 519, n. 15).[31]

Highly relevant to the present inquiry is the invalidation of post-*Furman* statutes requiring mandatory death sentences

---

[31] See also *Enmund*, 458 U. S., at 794–796; *Coker* v. *Georgia*, 433 U. S., at 596–597 (plurality opinion).

because they broke the critical link provided by the jury
between the death penalty and community standards:

> "[E]vidence of the incompatibility of mandatory death
> penalties with contemporary values is provided by the
> results of jury sentencing under discretionary statutes.
> In *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), the
> Court observed that 'one of the most important functions
> any jury can perform' in exercising its discretion to
> choose 'between life imprisonment and capital punish-
> ment' is 'to maintain a link between contemporary com-
> munity values and the penal system.' *Id.*, at 519, and
> n. 15. Various studies indicate that even in first-degree
> murder cases juries with sentencing discretion do not
> impose the death penalty 'with any great frequency.'"
> *Woodson*, 428 U. S., at 295 (plurality opinion) (footnote
> omitted) (quoting H. Kalven & H. Zeisel, The American
> Jury 436 (1966)).

We therefore concluded that "North Carolina's mandatory
death penalty statute for first-degree murder departs mark-
edly from contemporary standards respecting the imposition
of the punishment of death and thus cannot be applied
consistently with the Eighth and Fourteenth Amendments'
requirement that the State's power to punish 'be exercised
within the limits of civilized standards.'" 428 U. S., at 301
(footnote omitted) (quoting *Trop* v. *Dulles*, 356 U. S., at 100
(plurality opinion)).

That the jury provides a better link to community values
than does a single judge is supported not only by our cases,
but also by common sense. Juries—comprised as they are of
a fair cross section of the community[32]—are more represent-
ative institutions than is the judiciary; they reflect more
accurately the composition and experiences of the community
as a whole, and inevitably make decisions based on commu-
nity values more reliably, than can that segment of the com-

---

[32] See, *e. g.*, *Duren* v. *Missouri*, 439 U. S. 357 (1979).

munity that is selected for service on the bench.[33]   Indeed, as the preceding discussion demonstrates, the belief that juries more accurately reflect the conscience of the community than can a single judge is the central reason that the jury right has been recognized at the guilt stage in our jurisprudence. This same belief firmly supports the use of juries in capital sentencing, in order to address the Eighth Amendment's

---

[33] In his valuable article, Professor Gillers has written:

"Intuitively, juries, chosen in accordance with rules calculated to assure that they reflect a 'fair cross-section of the community,' are more likely to accurately express community values than are individual state trial judges. This is true because twelve people are more likely than one person to reflect public sentiment, because jurors are selected in a manner enhancing that likelihood, and because trial judges collectively do not represent—by race, sex, or economic or social class—the communities from which they come.   The response of a representative jury of acceptable size is consequently taken to be the community response.   The jury does not try to determine what the community would say, but in giving its conclusion, speaks for the community.   The judge, on the other hand, must assess the community's 'belief' or 'conscience' and impose it or must impose his own and assume it is the community's.   Whichever the judge does, the representative jury would seem to have a substantially better chance of identifying the community view simply by speaking its mind.

"The intuitive expectation that a representative jury of adequate size will convey community values more reliably than will a single judge finds support in cases treating jury composition at culpability trials.   In this related area, the Court has stressed the importance of a representative jury as an aid in assuring 'meaningful community participation,' and has accepted the idea that different segments of the community will bring to the representative jury 'perspectives and values that influence both jury deliberation and result.'   In addition, the Court has said that juries of decreasing size have a reduced chance of reflecting minority viewpoints. The Court's conclusions that the size and representativeness of juries influence their ability to reflect community values support an inference that a representative jury of adequate size is also more likely than a single judge to reflect the community's retributive sentiment.   Indeed, since capital sentencing involves application of community values, whereas guilt-determination predominantly demands factfinding, the Court's conclusions would seem to apply with even greater force in the capital sentencing area."   Gillers, Deciding Who Dies, 129 U. Pa. L. Rev. 1, 63–65 (1980) (footnotes omitted).

concern that capital punishment be administered consistently with community values. In fact, the available empirical evidence indicates that judges and juries do make sentencing decisions in capital cases in significantly different ways,[34] thus supporting the conclusion that entrusting the capital decision

---

[34] A respected study of the matter found that judges and juries disagree as to the imposition of the death penalty in 59 percent of the cases, with juries being much more likely to show mercy than judges. See H. Zeisel, Some Data on Juror Attitudes Toward Capital Punishment 37–50 (1968). This study must be viewed with some caution, because it was based on pre-*Furman* sentencing, when juries were given no guidance concerning the standards for decision. See Zeisel, *supra*, at 37–38, and n. 29. But then there were no standards for judges to follow either, and the wide disparity between judge and jury sentencing in an era in which all the sentencer could do was express its sense of proportionality, see *Witherspoon*, 391 U. S., at 519, and n. 15, suggests that judicial sentencing does not reflect the same moral sensibility as does jury sentencing. That there has been such a large number of jury overrides under the Florida statute tends to indicate that the disparity between judge and jury has continued in the post-*Furman* era. Indeed, the facts of this very case illustrate the point. While the crime for which petitioner was convicted was quite horrible, the case against him was rather weak, resting as it did on the largely uncorroborated testimony of a drug addict who said that petitioner had bragged to him of having killed a number of women, and had led him to the victim's body. It may well be that the jury was sufficiently convinced of petitioner's guilt to convict him, but nevertheless also sufficiently troubled by the possibility that an irrevocable mistake might be made, coupled with evidence indicating that petitioner had suffered serious head injuries when he was 20 years old which had induced a personality change, App. 35, see also 433 So. 2d, at 512 (McDonald, J., dissenting), that the jury concluded that a sentence of death could not be morally justified in this case. A judge trained to distinguish proof of guilt from questions concerning sentencing might react quite differently to this case than would a jury. See H. Melville, Billy Budd 72 (Pocket Books 1972) ("For the compassion how can I otherwise than share it. But, mindful of paramount obligations I strive against scruples that may tend to enervate decision. Not, gentlemen, that I hide from myself that this case is an exceptional one. Speculatively regarded, it well might be referred to a jury of casuists. But for us here acting not as casuists or moralists, in a case practical, and under martial law practically to be dealt with").

to a single judge creates an unacceptable risk that the decision will not be consistent with community values.

Thus, the legitimacy of capital punishment in light of the Eighth Amendment's mandate concerning the proportionality of punishment critically depends upon whether its imposition in a particular case is consistent with the community's sense of values. Juries have historically been, and continue to be, a much better indicator as to whether the death penalty is a disproportionate punishment for a given offense in light of community values than is a single judge. If the prosecutor cannot convince a jury that the defendant deserves to die, there is an unjustifiable risk that the imposition of that punishment will not reflect the community's sense of the defendant's "moral guilt." The Florida statute is thus inconsistent with "the need for reliability in the determination that death is the appropriate punishment in a specific case," *Woodson*, 428 U. S., at 305 (plurality opinion); it "introduce[s] a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." *Beck* v. *Alabama*, 447 U. S. 625, 643 (1980). As a result, the statute "creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett* v. *Ohio*, 438 U. S. 586, 605 (1978) (plurality opinion). Once a State, through specification of aggravating circumstances and meaningful appellate review of jury verdicts, develops a capital sentencing process which in the aggregate distinguishes between those who may live and those who will die in some acceptably nonarbitrary way,[35] *Furman* and its progeny provide no war-

---

[35] See *Pulley* v. *Harris*, 465 U. S. 37 (1984); *id.*, at 54 (STEVENS, J., concurring in part and concurring in judgment); *Zant* v. *Stephens*, 462 U. S., at 878–879; *Gregg*, 428 U. S., at 196–198, 200–204 (opinion of

rant for—indeed do not tolerate—the exclusion from the capital sentencing process of the jury and the critical contribution only it can make toward linking the administration of capital punishment to community values.

## VIII

History, tradition, and the basic structure and purpose of the jury system persuade me that jury sentencing is essential if the administration of capital punishment is to be governed by the community's evolving standards of decency. The constitutional legitimacy of capital punishment depends upon the extent to which the process is able to produce results which reflect the community's moral sensibilities. Judges simply cannot acceptably mirror those sensibilities—the very notion of a right to jury trial is premised on that realization. Judicial sentencing in capital cases cannot provide the type of community participation in the process upon which its legitimacy depends.

If the State wishes to execute a citizen, it must persuade a jury of his peers that death is an appropriate punishment for his offense. If it cannot do so, then I do not believe it can be said with an acceptable degree of assurance that imposition of the death penalty would be consistent with the community's sense of proportionality. Thus, in this case Florida has authorized the imposition of disproportionate punishment in violation of the Eighth and Fourteenth Amendments. Accordingly, while I join Part II of the opinion of the Court, with respect to the remainder of the Court's opinion and its judgment, I respectfully dissent.

---

Stewart, POWELL, and STEVENS, JJ.); *id.*, at 221–224 (WHITE, J., concurring in judgment).