UNITED STATES, Plaintiff,

v.

Gregory BOGAN, Elvis Robinson, Manuel Robinson, Defendants.

No. CR–91–551 VRW.

United States District Court, N.D. California.

April 27, 1992.

Barry J. Portman, Federal Public Defender, San Francisco, Cal., for defendant Elvis Robinson.

Gregor D. Guy–Smith, San Francisco, Cal., for defendant Manuel Robinson.

Henry G. Wykowski, Law Offices of Henry G. Wykowski, Appointed Counsel, Federal Public Defenders Panel, San Francisco, Cal., for defendant Gregory Bogan.

William T. McGivern, Jr., U.S. Atty., Floy E. Dawson, Chief, Crim. Div., George L. Bevan, Jr., Asst. U.S. Atty., San Francisco, Cal., for plaintiff U.S.

## AMENDED ORDER MODIFYING SENTENCES FOLLOWING RECONSIDERATION

WALKER, District Judge.

Elvis and Manuel Robinson, together with Gregory Bogan, pleaded guilty to armed robbery, and conspiracy to commit armed robbery, of a federally insured cred-

it union. As will be explained, each defendant's offense level totalled 23 under the applicable provisions of the United States Sentencing Commission, Guidelines Manual (1990 edition) (hereinafter "Sentencing Guidelines"). Due to their differing criminal histories, this total produced a Guideline incarceration range of 51 to 71 months for Elvis Robinson, and 70 to 87 months for both Manuel Robinson and Bogan.

Believing that such periods of incarceration understated the seriousness of defendants' criminal conduct, the government sought to increase the severity of defendants' sentences. Although rejecting the government's rationalizations for such increases, the court nonetheless found itself in agreement that these sentences were too lenient and, therefore, decided to order defendants also to reimburse the government for the cost of their incarceration.

On March 13, 1992, defendants moved to set aside the portion of their sentences requiring reimbursement on the ground that defendants are poor, making such an obligation inappropriate. This, contend defendants, is a fine that should be reserved for criminal defendants who have the means to pay it.

■ The government endorses a reimbursement obligation, but suggests that the court has not adequately explained its reasoning. At a hearing conducted on March 27, 1992, upon inquiry by the court all defendants and the government agreed that the court could modify the sentences and supplement the record notwithstanding defendants having filed appeals, a step requiring the finality of this court's judgments and a resulting end of its jurisdiction over these cases. 28 U.S.C. § 1291. The exclusivity of appellate jurisdiction is a rule of judicial prudence and not absolute, see *Masalosalo by Masalosalo v. Stonewall Insurance Co.*, 718 F.2d 955, 956–57 (9th Cir.1983). Because, upon reflection, the court agrees that its sentencings require further explanation and modification to conform to the Sentencing Guidelines, it enters this order as requested by the parties.

## I.

In addition to the two offenses to which defendants pleaded, the indictment charged all three defendants with violation of 18 U.S.C. § 924(c), carrying a firearm during a crime of violence, and Bogan with violation of 18 U.S.C. § 922(g)(1), felon in possession of a firearm. Conviction on these charges as well as the robbery counts would have tacked five years onto defendants' sentences. 18 U.S.C. §§ 922(c)(1), 929(a)(1). But it developed that the gun in question was manufactured in 1897 and thus an "antique firearm" under 18 U.S.C. § 921(a)(16). The enhancement statute for crimes involving a firearm expressly excludes guns manufactured before 1898, 18 U.S.C. § 921(a)(3), a legislative ornament of doubtful appeal to anyone on the wrong end of such a curio.

Nonetheless, the government pointed to Bogan's possession of this weapon as a basis to enhance the sentences of all three defendants. The government claimed that the weapon was "otherwise used," which would have had the effect of adding four points to the 20 point base offense level for the robbery counts. Sentencing Guidelines § 2B3.1(b)(2)(B). Defendants maintained that the gun was merely "brandished," yielding only a three point increase. Sentencing Guidelines § 2B3.1(b)(2)(C).

To be sure, the Guidelines' distinction between "brandished" and "otherwise used" entails some subtlety. The former means that "the weapon was pointed or waved about or displayed in a threatening manner" while the latter means less than "discharge" but "more than brandishing, displaying or possessing a firearm." Sentencing Guidelines § 1B1.1 Appl.Notes 1(c), (g).

■ Although the Manuel Robinson presentence report concluded that a firearm was "otherwise used," the conduct described in the report was more consistent with display "in a threatening manner." The report stated that "the gun was pointed at victims as a threat of death was made, 'Get down or I'll kill you.'" The credit union employees' declarations relate:

"He then put the gun in my face, and said 'Don't look at me.'" Price Declaration. "[I] saw this person with a gun aiming a gun at me with both hands, and made the following statement: 'Don't look at me. Look down. Lie down or I will shoot you.'" Almeida Declaration. Because brandish means a menacing pointing or display of the weapon rather than its employment in a physical act of the robbery, and since the presentence report and victim declarations indicate that defendants did the former, the court stepped up the offense only three points. Sentencing Guidelines § 2B3.1(b)(2)(C).

■ The government further contended that the credit union employees were restrained, which would have warranted a two point increase for "physical restraint." Sentencing Guidelines § 2B3.1(b)(4). But the evidence did not reasonably establish that anyone had been "physically restrained," as opposed to being pushed, pulled or grabbed. Accordingly, the court found this increase also inappropriate.

■ Finally, the government asserted that the credit union employees suffered serious emotional and psychological trauma as a result of the robbery, permitting a two point increase in the Guidelines tally. Sentencing Guidelines § 5K2.3. But the evidence, while demonstrating that the robbery traumatized the employees, did not establish *extreme* psychological injury as specified in the Guidelines.

The credit union employees' declarations recount an all too common modus operandi for crimes of this nature. The robbers stormed into the credit union, two jumping over a teller counter, grabbing and pushing one employee, pulling another to the floor, saying, "Drop what you're doing," "Get your hands up and get away from the desk," "Lie down or I'll shoot you," "Shut up bitch," "Don't look at me, I know you're trying to I.D. me," "Shoot 'em, shoot 'em" and the like. Declarations of Wagner, Garibaldi, Price, Almeida. The employees, of course, were terrorized. One declared that she now gets a "sick feeling in the pit of my stomach" when a stranger enters her office and knows she will never feel safe again; another's fright caused her to soil herself and she now feels jumpy when someone comes into the credit union. Declarations of Wagner, Garibaldi.

The government contends that these reactions are extreme. In doing so, the government demeans its own declarants. Their reactions appear, to this judge at least, quite normal, far from extreme, and certainly do not evince susceptibility to fright out of the ordinary. Decent and law abiding citizens are entitled to feel the terror, fright and outrage described by declarants in the face of armed robbery without their government suggesting that they possess less than usual fortitude in order to deem their reaction extreme.

Finally, two points were added and then subtracted because federally insured credit union property was taken and defendants accepted responsibility. Sentencing Guidelines §§ 2B3.1(b)(1), 3E1.1. The result of these determinations confirmed offense level totals of 23 for each defendant and the Guideline incarceration ranges noted above. The court's review of these determinations upon reconsideration confirms their correctness.

The court's reconsideration also confirms the appropriateness of imposing fines on these defendants, but discloses a need to modify that portion of the sentences to be consistent with the Sentencing Guidelines and further to explain this determination. In that regard, the court freely admits that prior to this case, it did not fully appreciate the interplay of the various types of punishments authorized by the Sentencing Guidelines.

II.

A salutary feature of the Sentencing Guidelines appears to be their emphasis on fines. This is evident from the legislation promulgating the Guidelines. See 18 U.S.C. § 3571. Fines imposed by the 1990 Sentencing Guidelines are of four types: (1) restitutionary fines to compensate the victims of the offense; Sentencing Guidelines § 5E1.1; (2) penal fines "sufficient to ensure that the fine, taken together with

other sanctions imposed, is punitive;" Sentencing Guidelines § 5E1.2(e); (3) reimbursement fines in an "amount that is at least sufficient to pay the costs to the government of any imprisonment, probation, or supervised release ordered;" Sentencing Guidelines § 5E1.2(i); and (4) special assessments to support the Crime Victims Fund. Sentencing Guidelines § 5E1.3.

■ If the court does not impose a restitutionary fine, the Sentencing Reform Act of 1984 requires the court to explain why not. 18 U.S.C. § 3553(c). In this case, no restitution was ordered because the stolen money was fully recovered, and neither the credit union employees, nor anyone else, suffered injuries. The Crime Victims Fund assessment is not waivable and was imposed on each defendant. These matters are not in dispute. Rather, the present concern is the proper application of the penal and reimbursement fine provisions. Sentencing Guidelines § 5E1.2(a), (i).

In broad terms, the court finds the emphasis which the Guidelines place on fines to be salutary because as a general rule for most crimes, fines are greatly preferable to incarceration as a form of punishment. The Sentencing Guidelines also impose incarceration, often in significant amounts. But to the extent that the Guidelines increase the fine component relative to incarceration, the Guidelines are implementing the teachings of a growing scholarship on the subject of punishment.

This scholarship suggests that a regime of fines may be as or more effective as punishment than incarceration and far less costly. See Gary S. Becker and George J. Stigler, *Law Enforcement, Malfeasance, and Compensation of Enforcers,* 3 J Legal Stud 1 (1974). Of the desiderata advanced by Congress for criminal sentences—"just punishment," deterrence, incapacitation and rehabilitation, 18 U.S.C. § 3553,—incarceration directly fosters only the goal of incapacitation. Deterrence can often be achieved as well by a fine if set at appropriate levels. Because rehabilitation is probably more efficacious outside prisons, which appear to be breeding grounds for criminality, fines are probably a more desirable form of punishment than incarceration from that standpoint.[1] True enough, no amount of fine (or incarceration for that matter) may deter certain crimes and hence would not be appropriate; such crimes would include those where the probability of detection and conviction approaches zero or the cost to the victim approaches infinity (e.g., homicide). See Richard A. Posner, *Economic Analysis of Law* at 209–212 (Little Brown, 3d ed 1986).

But where workable, fines represent a more desirable form of punishment because they avoid the deadweight loss to society of incarceration. Not only are the taxpayers saddled with the considerable cost of keeping a defendant behind bars, but whatever productive endeavor the defendant might otherwise undertake is lost. Notably, incarceration does nothing to compensate the victims of crimes. Fines, on the other hand, require criminals to repay society for the harm they inflict on both their immediate victims and the commonweal and thus are a socially less costly form of punishment. See Gary S. Becker, *Crime and Punishment: An Economic Approach,* 76 J Pol Econ 169 (1968). The ideal regime of punishments would rely on fines for the lion's share of crimes. The Sentencing Guidelines step in this direction, a move which should not be obscured by their continuing use of incarceration. The hitch to this penological approach, of course, is the uncertain ability of most criminals to pay their fines.

### III.

■ Defendants in this case have not, as they must, clearly established their inabili-

---

1. As for "just punishment," this appears to be a modern day proxy of sorts for retribution, a sentencing goal more appropriate to primitive societies than to modern ones. As social mobility increases and the probability of detection and conviction for a society drops below one, a policy of meting out punishment scaled to the victim's loss ("an eye for an eye") falls short of fully compensating society for its loss. Richard A. Posner, *Retribution and Related Concepts of Punishment,* 9 J Legal Stud 71, 75–83 (1980); compare *Spaziano v. Florida,* 468 U.S. 447, 461, 104 S.Ct. 3154, 3162, 82 L.Ed.2d 340 (1984).

ty to pay fines. *United States v. Quan–Guerra*, 929 F.2d 1425 (9th Cir.1991). Manuel Robinson's attorney requested that he be present at any interview by the probation officer, but then seemed always unavailable to aid the probation officer in eliciting the relevant facts. See *United States v. Rafferty*, 911 F.2d 227 (9th Cir. 1990), for a similar situation. Only limited information was given to the probation officer on Bogan's financial situation, so the officer speculated, but did not determine, that Bogan was without resources. Elvis Robinson's presentence report inferred an inability to pay from his custody status, but the issue was not definitively addressed. Defendants' representation by assigned counsel is an indicator of present inability to pay a fine and may indicate a future inability as well. Sentencing Guidelines § 5E1.2 Appl.Note 3. But this indication is not conclusive and the burden of establishing present or future inability to pay rests with defendants, and even though they were offered the opportunity to supplement the record at the March 27 hearing, they declined to do so.

The presentencing reports establish the following pertinent facts:

—Gregory Bogan is married and has provided assistance in the care of his five year old child and his wife's three other children aged nine, thirteen, and fifteen. Mrs. Bogan has a kidney problem that requires at home dialysis three times a day. Bogan received an inheritance that, properly managed, would have provided him a solid financial base, but which he appears to have squandered. He has a college degree and has worked in the restaurant business and as a hair-stylist. Bogan claims that respiratory problems impair his employability. He made no effort to explain how he could afford to own an antique firearm.

—Elvis Robinson has one dependent child, approximately eight years old, from a previous relationship, and the woman with whom he is currently involved is about to have another child. Elvis Robinson dropped out of high school in twelfth grade. He was working as a carpenter at $280 a week and performing odd jobs at $200 to $300 a week in the months preceding the robbery.

—Manuel Robinson has two dependent children, ages unspecified. He also left school in the twelfth grade. At the time of his guilty plea, Manuel Robinson was employed as a painter at $900 a month. He had also worked as a musician.

While no one can seriously contend that any of these defendants is a good bet to pay a significant fine, defendants have done very little to discharge their burden of proof on this issue. The court will notwithstanding assume arguendo that they have satisfied this burden. Given that assumption, defendants argue that under *United States v. Seminole*, 882 F.2d 441 (9th Cir. 1989), present inability to pay ends the inquiry and precludes the imposition of a fine. This misreads *Seminole*. First, *Seminole* interpreted United States Sentencing Commission, Guidelines Manual § 5E4.2(d)(2) (1988), a section which does not exist within the 1990 version applicable to this case. *Seminole*, 882 F.2d at 443.

Second, neither the specific language of *Seminole*, nor the relevant Sentencing Guidelines, forecloses a *future* determination of a defendant's ability to pay. "Because Seminole is currently indigent, the district court may only impose a fine if it decides Seminole has sufficient earning capacity to pay the fine *following his release* from prison [citing inapplicable Sentencing Guidelines § 5E4.2(d)(2) ]." *Seminole*, 882 F.2d at 443 (emphasis supplied). *Seminole* does not hold that a sentencing court may not impose a fine contingent upon the requisite earning capacity determination being made at the time of defendants' release from prison. A fine conditioned upon a post-incarceration determination of ability to pay would meet the *Seminole* standard.

Moreover, even if *Seminole* contained as expansive a holding as defendants suggest, the Sentencing Guidelines distinguish current ability to pay from future ability to pay, introduce an additional factor of burden to dependents, and then require consideration of alternatives:

If the defendant establishes that (1) he is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine required by the preceding provisions, or (2) imposition of a fine would unduly burden the defendant's dependents, the court may impose a lesser fine or waive the fine. In these circumstances, the court shall consider alternative sanctions in lieu of all or a portion of the fine, and must still impose a total combined sanction that is punitive. Although any additional sanction not proscribed by the guidelines is permissible, community service is the generally preferable alternative in such instances.

Sentencing Guidelines § 5E1.2(f).

Thus, the court may not simply waive a fine because of defendants' present or future inability to pay or dependent burden, but must consider alternative sanctions to ensure a "total combined sanction that is punitive."

### IV.

Sentencing Guidelines § 5E1.2(f) thus requires courts to impose punitive sanctions which cannot simply be avoided on a showing of present or future poverty. Such avoidance would also contradict the Guidelines' rejection of socioeconomic status as a relevant sentencing characteristic. Sentencing Guidelines § 5H1.10. Poor criminals would thereby be given a bankruptcy option not available to those able to pay. By directing courts to consider alternative sanctions in lieu of fines, the Guidelines clarify that no offenders are beyond the scope of punishment by reason of their economic status. In this respect, too, the Guidelines appear to reflect scholarly insights. See, e.g., Roger L. Faith and Robert D. Tollison, *The Pricing of Surrogate Crime and Law Enforcement*, 12 J Legal Stud 401 (1983).

Any other course diminishes the disincentives of criminal sanctions for persons able to avoid them by pleas of poverty. A poor offender inflicts no less harm on crime victims or on society than a well-to-do one. The Sentencing Guidelines' option of relieving an offender of the obligation to pay a fine is thus not some form of dispensation or solace for the offender's economic status. It is instead a recognition that some offenders may not be able to pay, and a direction to courts in those cases to impose an alternative punishment.

In this case, applying these provisions of the Guidelines achieves substantial justice and provides defendants the right incentives. Upon their release, defendants' conditions of supervised release will require them to pay a monetary fine or perform community service, or some of both, as directed by the probation office. Failure to fulfill these obligations will be deemed a violation of their release terms and result in appropriate penalties, including possible further incarceration. This direction is not an effort to lengthen defendants' incarceration through some back door in the sentencing laws. Instead, it is an incentive for these defendants to demonstrate responsibility.

For these reasons, the sentences of defendants herein are modified to impose the following fines and additional conditions of their period of supervised release:

Defendants shall pay the maximum penal fine of $100,000.00, and shall reimburse the government for the cost of their incarceration at $1,492 for each month and $115.30 for each month of supervised release, in such amounts and at such times as directed by the probation officer. This obligation should in no way preclude defendants' participation in the Federal Bureau of Prisons Inmate Financial Responsibility Program, established pursuant to 28 CFR § 545.10 et seq., during their incarceration. To the extent that this obligation remains unsatisfied at the time of defendants' release from incarceration, it is recommended to the probation officers overseeing defendants' supervised release that partial payments be credited to the penal and reimbursement fine components in proportion to the outstanding balance of each fine at the date of each payment and that defendants' fine obligations be calculated monthly by dividing the total fine obligation by the total months of supervised release.

Further, in the event that a defendant establishes to the satisfaction of the probation office an inability to pay all or any part of the fine obligations for any month during supervised release, each defendant shall perform community service in the amount of 500 hours per year during each year of supervised release for the maximum period of supervised release. At least 100 hours of community service shall be performed during each three month quarter of supervised release in which the fine obligation is not fully satisfied. Defendants shall be allowed to offset the community service obligation for any quarter with partial payment of fines in direct proportion to their total fine obligation for that period. The other terms of the judgments heretofore entered shall remain.

The clerk shall prepare modified judgments.

IT IS SO ORDERED.