993 So.2d 400 (2008)
Patricia SIMPSON a/k/a Patricia L. Simpson, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2006-KA-01366-COA.
Court of Appeals of Mississippi.
May 27, 2008.
Rehearing Denied August 5, 2008.
Certiorari Denied October 30, 2008.
*401 Glenn S. Swartzfager, Leslie S. Lee, Jackson, attorneys for appellant.
Office of the Attorney General, by John R. Henry, attorney for appellee.
Before LEE, P.J., CHANDLER and BARNES, JJ.
BARNES, J., for the court.
¶ 1. Patricia Simpson appeals her conviction and sentence ordered by the George County Circuit Court, after a bench trial. The trial judge, sitting as the fact-finder, found her guilty of the crime of manslaughter of her husband, Don Simpson, and sentenced her to twenty years in the custody of the Mississippi Department of Corrections, with the last five years of the sentence served under post-release supervision. Patricia raises three issues: (1) whether the evidence was sufficient to support the verdict; (2) whether due process will allow the conviction of manslaughter to stand; and (3) whether the verdict was against the overwhelming weight of the evidence. Finding no error, we affirm her conviction and sentence.

FACTS AND PROCEDURAL HISTORY
¶ 2. On December 22, 2003, emergency personnel, responding to a 911 dispatch call, arrived at the Simpsons' home near Lucedale, Mississippi at approximately 8:20 p.m. The paramedics were aware that Patricia had called 911 at approximately 8:00 p.m. to report that her husband "was cleaning a gun," and it accidentally discharged. Patricia, who had spent the day doing last minute Christmas shopping, answered the door and led the paramedics to the kitchen, where they found Don lying face down on the floor with a .22 revolver near his knee. The paramedics were unable to find a pulse on Don's body. It was determined that Don had sustained a single gunshot wound to the middle of his chest. Patricia then picked up the gun and put her finger on the trigger, allegedly to show the paramedics the weapon. Alarmed, the paramedics instructed her three times to drop the gun before she complied. Patricia did not offer any explanation as to what happened. Nobody else appeared to be present in the house. Don was pronounced dead on arrival at a hospital in Mobile.
¶ 3. Law enforcement officers arrived on the scene after the paramedics and interviewed Patricia. She explained that Don had been wanting to clean the old pistol but did not know how. Patricia was upstairs *402 when she heard the gun fire. She came downstairs and found Don lying face down in the kitchen. She did not offer anything further as to what occurred. Officers found Patricia's demeanor to be quiet, withdrawn, and upset. Upon a cursory inspection of the house, the officers found no gun cleaning kit and asked Patricia about this fact. She told the officers that Don did not have any gun cleaning materials and that she did not know to whom the gun belonged. Officers noticed the phone in the kitchen was covered with a large amount of blood.
¶4. Mr. and Mrs. Thrower and Faye Holifield, church friends of the Simpsons, arrived at the scene as Don's body was being put into the ambulance. Holifield, who lives close to the Simpsons, testified that the kitchen appeared immaculate, except for the blood on the phone and a few drops of blood on the kitchen floor. Holifield testified that Patricia's demeanor appeared calm as she prepared to be taken to the hospital by Mr. Thrower. Again, Patricia did not offer any explanation to her friends as to what occurred. Mrs. Thrower testified that Patricia specifically told her not to call any family members about Don's death. With permission from law enforcement, Holifield and Mrs. Thrower stayed at the Simpsons' home and cleaned up. They found no gun cleaning materials. While en route to the hospital in Mobile, Patricia called her home and asked Mrs. Thrower and Holifield to retrieve from her coffee table and put away workbooks from a recent marriage enrichment weekend in Fairhope, Alabama. Mrs. Thrower took the workbooks upstairs. After Patricia returned from the hospital, Holifield stayed with her the rest of the night. Holifield testified that there was little conversation between them, and Patricia's demeanor was calm and quiet. Patricia stayed up the entire night cleaning the house and doing laundry. Holifield also remembered that, a few weeks prior to the shooting, Patricia had asked her several times where she could get a gun cleaned because Don did not know anything about guns, and she had to get one cleaned.
¶ 5. Patricia did not immediately contact Don's family members about his death. Don's daughter, by a previous marriage, initially heard from her brother in California on December 23 that her father had died in an automobile accident. Upon calling the George County Sheriff's Office, she discovered that he had died in a shooting. After visiting five funeral homes, she found her father's remains, only to discover he had already been cremated. Several months after the shooting, Patricia told Don's daughter the shooting had been a "horrible accident." Patricia also later told her sister the shooting was an accident.
¶ 6. Stan Keebler, whom Don supervised at work, testified that on the morning of December 24, Patricia had called the office to ask someone to deposit Don's payroll check. She asked to speak to Keebler about being an honorary pallbearer at Don's funeral. He testified she was not upset. Keebler asked her what had happened, and she maintained that Don was cleaning a very old gun when it accidentally discharged. Patricia also wanted to go into her husband's office to retrieve a photograph for the funeral. When she was told that the office was locked out of respect for Don, she informed them that she had her husband's keys. Later, it was discovered that Patricia had come to the office late at night; however, the picture she had wanted was not used in the funeral.
¶ 7. Evidence presented at trial reflected that while Don had been "pretty comfortable" financially before his marriage to Patricia *403 in 1998, he was in "financial crisis" at the time of his death. Don had worked as a salesman for a labor support company since 1990. In 2002, Don was making approximately $123,000 per year, purely on commission.[1] Because of a slump in the labor market, Don only made approximately $43,000 in 2003. Because of the drop in his income, the business's owner, Wayne Cook, Jr. (Cook, Jr.), advanced Don $1,000 a week against future commissions he might earn, in order to pay his monthly bills. This arrangement continued until Don's death. Don, who had gone to high school with and was good friends with Cook, Jr.'s father, Wayne Cook, Sr. (Cook, Sr.), confided to Cook, Sr. about his "financial crisis." Around 2001 to 2002, Don had purchased his current home in Lucedale and had made extensive renovations to it. Cook, Jr. also testified that "everything changed" once Don married Patricia. Don did not live a flashy lifestyle; yet, after his marriage to Patricia, Don went from driving a truck to a Mercedes-Benz.
¶ 8. Shortly after Don's death, Patricia's son by a previous marriage, Michael Tompkins, requested a meeting with Don's employers.[2] Present at the meeting were Cook, Sr.; Cook, Jr.; Tompkins; and Patricia. Cook, Jr. asked Patricia directly what happened to Don, but Tompkins responded for her, stating his mother was too upset to speak for herself. Tompkins stated that Don was cleaning an old rusty revolver that Patricia's father had given her when it went off. Specifically, Tompkins said Don was extracting an old bullet from the firearm's cylinder with a screwdriver. Cook, Sr. testified that he did not remember Don ever owning a gun, and he was surprised by this statement. Also, it was Cook, Sr.'s opinion that Don would know better than to clean a rusty gun with a screwdriver since Don had been in the Navy four years. At the meeting, Tompkins stated that Patricia wanted to know if she could continue to collect Don's salary even after his death and stay on the company's health insurance. Cook, Jr. responded, "absolutely not."
¶ 9. During the investigation of Don's death, records showed that Patricia herself had actually bought and registered the firearm at issue in 1976. Law enforcement also discovered Patricia had another firearm, which she had failed to mention earlier, a derringer that she kept in her car. Additionally, in January 2002, the Simpsons had bought a term life insurance policy on Don's life in the amount of $175,000. The policy indicated that Patricia was the primary beneficiary and her son, Michael Tompkins, was the secondary beneficiary. Then, in April 2003, the Simpsons bought another term life insurance policy for $200,000, with the same beneficiaries designated. At the insurance agent's office, the Simpsons explained that they were going to refinance their home and needed additional coverage on Don. On December 29, 2003, an insurance agent stated that a claim was made on those insurance policies.[3]
*404 ¶ 10. On April 1, 2004, Patricia was indicted for the murder of her husband. She pleaded not guilty and waived her right to a jury trial. On July 18, 2006, a four-day bench trial commenced in the George County Circuit Court. The evidence presented in the case was entirely circumstantial.
¶ 11. Numerous witnesses testified for the State and the defense. Patricia's 911 telephone call was played in court and entered into evidence. In it, Patricia explains "there's been a gunshot" and that her husband was cleaning a gun when it accidentally discharged. Initially, she stated Don was still breathing. She frantically asked the 911 operator if there was anything she could do and stated she was trying to blow in Don's mouth. Then, the 911 operator gave Patricia specific instructions on how to perform CPR until the ambulance arrived; the first step being to lay Don flat on his back and then remove his dentures. On the 911 tape, blowing sounds can be heard, as if Patricia were giving Don mouth-to-mouth resuscitation. However, on cross-examination, the State brought up the fact that the paramedics and law enforcement found Don's body lying face down on the kitchen floor. Patricia explained this contradiction by stating that in her hysteria over the situation, she misspoke on the 911 call, and Don was actually on his side when paramedics arrived, not on his stomach. She denied imitating CPR on the telephone.
¶ 12. Three forensic pathologists testified regarding the manner of Don's death. The main debate between the State and the defense regarding the experts' testimonies was whether the gunshot wound was a hard-contact wound, where the gun barrel would be pressed against the skin, indicating a suicide, or a distant gunshot wound, indicating a homicide. Dr. Leroy Riddick, who performed an autopsy on Don's body and wrote the preliminary and final autopsy report, testified for the State. He stated that at the hospital, Patricia had told a nurse that she wanted the death ruled an accident, and she did not want an autopsy performed. It was his opinion that the gunshot, which perforated Don's aorta, was fired at a distance of greater than three feet. However, he considered all manners of death, including suicide and accident. He based his opinion on the fact that after examining both the skin surrounding the wound and microscopic tissue sample slides of the wound track, he could not find any evidence of gunshot residue, soot, burning, stippling, or searing on the external skin or subcutaneous tissues. Nor was there a barrel imprint on the exterior of the wound. While some of the slides of tissue from the wound track did contain a few black particles, Dr. Riddick did not think they were gunshot residue, although he could not identify what the particles were. Furthermore, results from examination of the weapon did not indicate any "blow back blood" in the barrel, which would presumably be present in a hard-contact wound. Dr. Riddick concluded that there was no evidence of a hard-contact wound; thus, it was his opinion the wound was from a distant gunshot, thereby inflicted by another person. His final autopsy report showed the manner of death as homicide.
¶ 13. Dr. Steven Hayne testified as an expert forensic pathologist for both the defense on direct, and the State on rebuttal. Dr. Hayne reviewed Dr. Riddick's autopsy report and several tissue slides from the victim. While he observed some black, foreign specks on the slides of the wound track, in his opinion, these were not gunshot residue, but "artifacts." It was *405 Dr. Hayne's final opinion that Don sustained a distant gunshot wound from at least two feet away, indicative of a homicide. Later, testifying for the State in rebuttal, Dr. Hayne opined again that there was no scientific evidence that Don sustained a hard-contact wound.
¶ 14. Dr. Paul McGarry, also a forensic pathologist, testified for the defense. It was Dr. McGarry's opinion that Don sustained a contact gunshot wound, and thus, his manner of death was suicide. Dr. McGarry stated the evidence, which supported his opinion, was the location of the wound in the aorta and the downward left track of the wound. Also, he stated that with a .22 caliber weapon, it is generally harder to determine whether the wound is contact or distant because a .22 contact gunshot wound creates less charring and residue than other types of firearms. Additionally, he stated that not all contact wounds char the exterior flesh surrounding the wound. Finally, it was his opinion that in firearm deaths, individuals often attempt to make suicides appear as an accident, especially gun-cleaning accidents.
¶ 15. A firearms and ballistics expert also testified for the State. He discussed the numerous safety features found during his examination of the .22 caliber revolver.[4] The weapon contains two safety features: a hammer block and a hammer lock. Thus, in order to fire the revolver, the trigger and hammer lock must be pulled. Nor, when swabbed, did the revolver's muzzle produce any evidence of tissue, hair, or foreign stains like blood, which would be present in a contact gunshot. Photographic results from distance gunshot testing onto a cotton target were entered into evidence. At six inches from the revolver muzzle to the target, there was a great deal of soot or gunshot residue on the target. The residue gradually faded as the distance increased, until at thirty-six inches from the target, there was hardly any residue on the target. The expert testified this is because the residue dissipates in the air the further away the gun's muzzle is from the target.
¶ 16. Patricia, testifying in her own defense, maintained that Don had been frustrated over his job six to eight months before his death because he had been ordered by Cook, Jr. to split his sales commissions with a subordinate co-worker. Also, Don was traveling frequently on business. Patricia explained that she and her husband lived on fourteen acres, and recently they had been concerned about a "hobo" camp found in a corner of their property. Additionally, she explained the setup of the "panic room" in her home, which is a room with a solid door and a dead bolt lock that only locks from the inside. She also related how Don had drunk too much at the company Christmas party in December 2003 and had become agitated at the Cooks because of his small Christmas bonus. It was her opinion that Cook, Jr. treated her husband like a "redheaded stepchild."
¶ 17. Regarding the .22 revolver, Patricia explained that it was given to her by her father when she was a single parent, but she registered it in her name. Patricia insisted she does not know anything about guns, but she had been asking Don to clean the revolver for approximately five months because she wanted "to make sure it was in good operational condition." She emphasized that she was "terrified" to stay at home by herself when Don was out of town because their property was in a rural, densely forested area. She stated they kept the .22 revolver in a file cabinet in an office upstairs.
*406 ¶ 18. Concerning the marriage enrichment workbooks that she asked her friends to put away, Patricia claims this was merely because of intimate and personal things that Don had written to her. Patricia claimed all of the books were destroyed during Hurricane Katrina, except for the intimate writings at issue, which she saved and gave to her lawyers. She testified Don wrote her a love note every morning before he went to work. She insisted that she and Don did not have a fight on the evening of December 22. From upstairs, she merely heard a noise and found Don lying face up in the kitchen when she came downstairs. She did not know how emergency personnel and law enforcement initially found Don lying face down. She explained that she told the 911 operator Don was "cleaning a gun" because she just assumed that was what Don was doing. She claims she picked up the gun in the kitchen to show the emergency personnel what caused the wound. She does not remember much about her behavior after she returned from the hospital on December 22 because she was "in shock." She denied making a claim on the life insurance policies in December 2003, but she stated that her attorney did it on her behalf. Patricia testified that in January 2004, she was hospitalized for approximately one week for severe depression and post-traumatic stress disorder.
¶ 19. As far as whether Patricia thought her husband committed suicide, she testified that "I preferred to think not. I wouldn't want his family to have to live with that. I wouldn't want to have to live with that.... I did not want his memory to be left in everybody's mind that this was a possibility. I would prefer to think that it was an accident." Patricia denied telling a nurse at the hospital to put "accident" on Don's medical records, but she admitted she did not want an autopsy. She also admitted that she did not call Don's children immediately regarding his death until after she had finalized his burial plans. She testified that during her business meeting with the Cooks, her son inaccurately stated that Don was cleaning a rusty revolver with a screwdriver. However, she denied telling her son to say that. She explained that her son was only trying to get the Cooks to stop badgering her. She explained that she and her husband took out the second life insurance policy because they had refinanced their house. Finally, she adamantly denied the State's contention that when she returned home from a shopping expedition on December 22, she shot Don because he was angry at her for spending too much money on Christmas.
¶ 20. After approximately three hours of deliberation, the trial judge found Patricia not guilty of murder, but guilty of manslaughter. In arriving at his decision, the trial judge explained that from the evidence presented, Don's death was not an accident, but it was either suicide or homicide. He then decided that this case was a homicide based on two facts: (1) that Don did not have a motive to commit suicide and (2) that the tissue samples taken from the wound track had no scientific evidence of gunshot residue indicative of a contact wound. He opined that the homicide was sudden and unexpected. However, the trial judge stated he was not convinced beyond a reasonable doubt that the homicide was committed with deliberate design.
¶ 21. Following the trial judge's ruling, the defense made a post-trial motion for a judgment of acquittal notwithstanding the verdict (JNOV) or, alternatively, a new trial. Both motions were denied. Patricia was sentenced to serve twenty years in the custody of the Mississippi Department of Corrections, with the last five years served *407 on post-release supervision. Aggrieved, Patricia now appeals.

ANALYSIS OF THE ISSUES

I. Whether the verdict was against the sufficiency and weight of the evidence.
¶ 22. Since the analysis of Patricia's first and last issues overlap, we shall discuss them together. Regarding the sufficiency of the evidence, Patricia argues the Weathersby rule entitled her to a directed verdict of acquittal at trial. She also asserts that the evidence is insufficient to support a conviction of manslaughter. In the alternative, she argues she is entitled to a new trial, as the verdict is against the weight of the evidence.

A. The Weathersby Rule.
¶ 23. In Weathersby v. State, 165 Miss. 207, 209, 147 So. 481, 482 (1933) (citations omitted), the supreme court held:
[W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.
The rule is used as a guide as to whether a judge should grant a directed verdict, and a defendant who meets the Weathersby standard will be entitled to a directed verdict of acquittal. Blanks v. State, 547 So.2d 29, 33-34 (Miss.1989). This often-argued, but seldom-prevailing, rule is not applicable where the defendant's version of the story is unreasonable or contradicted by physical facts. Id.; Buchanan v. State, 567 So.2d 194, 197 (Miss.1990). In that case, where the Weathersby rule does not require a directed verdict of acquittal, it becomes a jury issue as to whether or not to believe the defendant's testimony as to how the killing occurred. Other circumstances which preclude application of the Weathersby rule are if the accused gives conflicting versions of how the killing took place or initially denies the act. Taylor v. State, 795 So.2d 512, 517(¶ 20) (Miss.2001) (citing Blanks, 547 So.2d at 33-34).
¶ 24. In this case, indisputably, Patricia was alone in the home with her husband when he was shot. However, we cannot consider Patricia an eyewitness since, by her own account, she maintains that she was upstairs when she heard the shot and saw nothing. Regardless of this fact, Patricia's version of the events of Don's death, which is the only version we have before us, is inconsistent and substantially contradicted by the physical facts.
¶ 25. Specifically, two of the three forensic pathologist expert witnesses, who testified at trial, agreed that Don's death was not a suicide because of the absence of any proof of a contact gunshot wound. It was Dr. Riddick's opinion the gun was fired at a distance greater than three feet, making it highly unlikely Don shot himself. The gunshot wound did not show evidence of a barrel imprint or gunshot residue, indicative of suicide. There was no microscopic evidence of gunshot residue found within the wound track, typical of a hard-contact wound. The weapon did not show any evidence of blow-back blood. Dr. Hayne agreed with Dr. Riddick's opinion. Dr. Hayne opined that Don sustained a gunshot wound from at least two feet away. Also, he did not find any evidence of a hard-contact wound, indicating suicide. While the third pathologist, Dr. McGarry, disagreed with the opinions of the other two experts, this merely created an issue for the fact-finder to determine. The expert testimonies of Drs. Riddick and Hayne contradict Patricia's account of the *408 shooting; however, there are other discrepancies as well.
¶ 26. There was no evidence to prove that Don was cleaning a gun at the time of his death. In fact, the evidence shows otherwise. No gun-cleaning supplies were ever located in the Simpson household. Patricia initially claimed, on the 911 call, that her husband shot himself accidentally while cleaning the gun, yet she also claimed she did not know Don had the gun or that he planned on cleaning it that evening. Her only explanation for this contradiction was that she just assumed that was what Don was doing. Moreover, there were two different versions of the gun-cleaning-accident explanationone from Patricia and the other from her son. Patricia did not discount her son's versionthat Don was cleaning a rusty gun with a screwdriveras inaccurate until later. Upon inspection, the gun was not rusty, or even in need of cleaning. Additionally, there were inconsistencies in Patricia's statements regarding her ownership of the gun, from her initially denying knowledge of it, to her admitting she did register the gun in her name.
¶ 27. Additionally, Patricia's conduct and statements following Don's death differ from her version of events recounted at trial. Patricia's explanation for Don's death went initially from an "accidental shooting" due to a gun-cleaning mishap, to suicide by the time of trial. Not once was suicide mentioned by Patricia as a possibility for Don's death on the night of the killing or in the days and weeks that followed. Patricia commented very little about the manner of Don's death to her family, her friends, or law enforcement. When she did, she labeled it an accident.
¶ 28. While there was no strong evidence that Patricia and Don were suffering marital discord, there was no strong evidence of a motive for suicide, either. Certainly, there was evidence of financial strain, which could have been a motive for Patricia's murdering Don, just as much as a motive for Don committing suicide. However, the testimonies from three witnesses employed with Don discounted the suicide explanation advanced by the defense at trial. This discrepancy in the evidence created an issue for the fact-finder.
¶ 29. Patricia cites to Dew v. State, 309 So.2d 857 (Miss.1975) as being dispositive of this issue. In Dew, the defendant, who was tried for murder and found guilty of manslaughter, was the only eyewitness to his wife's homicide, and his version made a case for an accidental shooting in self-defense. Id. at 858-59. The supreme court reversed the defendant's conviction and released the defendant. Id. at 859. In Dew, the defendant was the only person to testify regarding the events leading to the homicide; however, his testimony was "not controverted by either the physical facts or those of common knowledge," unlike the instant case. Id. Furthermore, in Dew, there were only slight discrepancies regarding the events of the evening at issue and the defendant's reputation, whereas here there are numerous large discrepancies, which we have discussed above.
¶ 30. We find that Patricia cannot be considered an eyewitness under Weathersby. Even if she could, the physical evidence contradicts Patricia's version of events given at trial and prior to trial. Thus, the Weathersby rule is not applicable. We find the trial judge acted properly in analyzing the factual discrepancies as the trier of fact. This issue is without merit.

B. Sufficiency of the Evidence.
¶ 31. Patricia argues the evidence was insufficient to support a conviction *409 of manslaughter. A directed verdict and a motion for JNOV both challenge the sufficiency of the evidence presented to the jury. McClain v. State, 625 So.2d 774, 778 (Miss.1993). This Court's standard of review is the same for both: we consider the evidence in the light most favorable to the State, giving the State "the benefit of all favorable inferences that may reasonably be drawn from the evidence." Collier v. State, 711 So.2d 458, 461(¶ 11) (Miss. 1998) (citation omitted). We ask whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss.2005) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). All credible evidence supporting the defendant's guilt will be accepted as true. McRee v. State, 732 So.2d 246, 249(¶ 9) (Miss.1999). This Court will reverse and render only when the facts point so overwhelmingly in favor of the defendant that reasonable men could not have found, beyond a reasonable doubt, that the defendant was guilty. Id. Additionally, the defense is correct in asserting that this is a circumstantial evidence case, that is, "one in which there is neither an eyewitness nor a confession to the crime." Stephens v. State, 911 So.2d 424, 437(¶ 43) (Miss.2005) (citing Mangum v. State, 762 So.2d 337, 344(¶ 21) (Miss.2000)). To sustain a conviction on circumstantial evidence, the evidence "need not exclude every `possible doubt,' but only every other `reasonable' hypothesis of innocence." Id. (quoting Neal v. State, 805 So.2d 520, 526(¶ 20) (Miss.2002)).
¶ 32. After careful review of the record, we find sufficient evidence to warrant a conviction of either deliberate-design murder or manslaughter. Deliberate-design murder is "[t]he killing of a human being without the authority of law by any means or in any manner shall be murder... [w]hen done with deliberate design to effect the death of the person killed...." Miss.Code Ann. § 97-3-19(1)(a) (Rev. 2006). Manslaughter is defined as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense." Miss.Code Ann. § 97-3-35 (Rev.2006). Here, the evidence is sufficient to prove the killing of a human being without authority of law. A deadly weapon was used. There was no evidence of self-defense. The record shows a rational fact-finder could find that Patricia killed Don with either deliberate design or in the heat of passion, without malice. "[D]eliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent." Brown v. State, 965 So.2d 1023, 1030(¶ 28) (Miss.2007) (quoting Gossett v. State, 660 So.2d 1285, 1293 (Miss.1995)). The supreme court "has acknowledged that deliberate-design connotes an intent to kill and may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury." Id. (citing Wilson v. State, 936 So.2d 357, 364(¶ 17) (Miss.2006)). In this case, while there was sufficient evidence to support deliberate-design murder, the fact-finder decided to convict on the lesser-included offense of manslaughter instead. We find no error in this regard, as our supreme court has held repeatedly that "where there is in the record evidence legally sufficient to support a jury finding of guilty of murder ... the defendant will not be heard to complain that a manslaughter instruction was given." Jackson v. State, 551 So.2d 132, 146 (Miss.1989) (citing Crawford v. State, 515 So.2d 936, 938 (Miss.1987)). This even includes situations where a "manslaughter *410 instruction was not warranted under the evidence." Id. (citing Cook v. State, 467 So.2d 203, 209 (Miss.1985)). While in this case no jury instructions were argued because it was a bench trial, the same legal principles apply.
¶ 33. Scientific evidence of the gunshot wound showed Don could not have inflicted it himself, either by accident or suicide. Two pathologists testified the shot was taken from at least two to three feet away. The wound track was even examined microscopically to determine the manner of death. There was no other physical evidence of suicide or accident. There was little motive for suicide. Don had not mentioned to Patricia he was going to clean the gun, nor was gun-cleaning equipment found. Since the physical evidence, as testified to by Drs. Riddick and Hayne, strongly supports that Don did not shoot himself, and there was no one else present in the Simpsons' home but Patricia, who is not claiming self-defense, it follows that she must be guilty of either murder or manslaughter. The evidence shows, and the trial judge remarked, that whatever happened was sudden and unexpected.
¶ 34. Patricia cites to Turner v. State, 773 So.2d 952 (Miss.Ct.App.2000), for the proposition that when a deadly weapon is used, malice is implied, and to overcome that presumption, there must be some evidence of heat of passion. Id. at 954(¶ 7) (citing Wilson v. State, 574 So.2d 1324, 1336 (Miss.1990)). However, this proposition is distinguishable from this case in that Turner, who was convicted of deliberate-design murder, argued that the trial court erred in not granting a manslaughter instruction. The supreme court found no error and affirmed the conviction. Here, the fact-finder considered deliberate-design murder and manslaughter, but he chose to convict Patricia of the lesser-included offense of manslaughter. On the evidence presented, taken in the light most favorable to the State, we cannot say that he erred in finding Patricia guilty of manslaughter. This issue is without merit.

C. Weight of the Evidence.
¶ 35. Patricia also argues that the verdict was against the overwhelming weight of the evidence, and thus, her motion for a new trial should have been granted. We review the trial court's denial of a motion for a new trial under an abuse of discretion standard. Johnson v. State, 904 So.2d 162, 167(¶ 11) (Miss.2005). This Court will overturn a verdict only when it "is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." Id. (quoting Esparaza v. State, 595 So.2d 418, 426 (Miss.1992)). All evidence "consistent with the defendant's guilt is accepted as true together with any reasonable inferences that may be drawn from that evidence." Young v. State, 891 So.2d 813, 821(¶ 21) (Miss.2005) (citing Heidel v. State, 587 So.2d 835, 838 (Miss. 1991)). Evidence will be analyzed "in the light most favorable to the verdict." Bush, 895 So.2d at 844(¶ 18) (citing Herring v. State, 691 So.2d 948, 957 (Miss.1997)). Factual disputes will be "properly resolved by the jury and do not mandate a new trial." Moore v. State, 859 So.2d 379, 385(¶ 26) (Miss.2003) (quoting McNeal v. State, 617 So.2d 999, 1009 (Miss.1993)).
¶ 36. Patricia argues there was no motive for murder since she waived her interest in Don's life insurance policies, and there was no evidence of marital discord. Further, there was no evidence of a fight on the night in question. She argues her emotional reaction to the death of her husband was appropriate under the circumstances. Yet, on the other hand, there was neither any evidence of a motive for Don's suicide nor any evidence of an accidental *411 death. Further, Patricia had not completely waived her right to the insurance proceeds at the time of trial, and even if she had, her son would have become the beneficiary under the policy. While emotional reactions to tragedy do vary, the conviction hinged on the scientific evidence that Don could not have shot himself. The conflicting evidence, as discussed above in the Weathersby issue, was properly resolved by the finder of fact.
¶ 37. We find, analyzing the evidence in the light most favorable to the verdict, allowing the verdict to stand does not sanction an unconscionable injustice. This issue is without merit.

II. Whether due process will allow the conviction of manslaughter to stand.
¶ 38. Patricia argues that the rule set forth by our supreme court in Mallette v. State, 349 So.2d 546, 550 (Miss. 1977), which states that a defendant cannot complain of a manslaughter verdict when the evidence would support a conviction of murder, violates her due process rights. Generally, she argues that this rule allows defendants to be convicted of crimes for which there is no evidence. Specifically, she states that, in this case, there is no evidence Don's death occurred in the heat of passion or as a result of provocation or argument, as required for manslaughter pursuant to Mississippi Code Annotated section 97-3-35 (Rev.2006). Thus, Patricia argues, while she was charged with murder, she could not be found guilty of manslaughter without violation of her constitutional right to due process.
¶ 39. Patricia proceeds to analyze the line of Mississippi cases articulating this rule. See Mallette, 349 So.2d 546 (Miss. 1977); King v. State, 251 Miss. 161, 168 So.2d 637 (1964); Triplett v. State, 159 Miss. 365, 132 So. 448 (1931); Calicoat v. State, 131 Miss. 169, 95 So. 318 (1923). The original rationale for this rule, Patricia explains, was a more merciful verdict that worked in favor of the defendant. See Triplett, 159 Miss. at 370, 132 So. at 450. The crux of Patricia's due process argument is that the rule assumes the finder of fact must discount the defendant's evidence, or lack thereof, and find beyond a reasonable doubt that the defendant unlawfully killed an individual. Patricia advocates our overruling this line of precedent in Mississippi.
¶ 40. The State argues this issue is procedurally barred as it was not raised at the trial court level. While the State is correct that the due process violation was not raised below, Patricia did raise the issue of whether there was sufficient evidence to support her conviction of the lesser-included offense of manslaughter in her motion for JNOV or, alternatively, a new trial. We find the issue properly before the Court, and we will discuss its merits. However, it is not within this Court's authority to change the state of the law in Mississippi regarding this issue, as Patricia proposes.
¶ 41. In Mississippi, a defendant in a criminal case can be found guilty of a lesser-included offense, so long as it is necessarily a lesser-included offense of the offense charged, without an additional count in the indictment. Miss.Code Ann. § 99-19-5(1) (Rev.2007). Additionally, an indictment for murder also includes the lesser-included offense of manslaughter. Miss.Code Ann. § 97-3-19(3) (Rev.2006). Importantly, the supreme court has specifically stated, "[t]he fact that manslaughter proof is inconsistent with that of murder is of no consequence. `By way of analogy, we consider heat of passion manslaughter a lesser-included offense to the charge of murder, even though that particular form of manslaughter contemplates proof of facts inconsistent with the principal charge *412 of murder.'" Shaw, 880 So.2d 296, 304(¶ 27) (Miss.2004) (quoting Grayer v. State, 519 So.2d 438, 440 n. 3 (Miss.1988)). In Shaw, at trial, the defendant was granted a directed verdict on his murder charge, and the trial court did not allow the State to submit to the jury whether Shaw was guilty of manslaughter. Shaw, 880 So.2d at 298(¶ 3). The State appealed the directed verdict, and the supreme court found that the trial court erred in this regard. Id. at 304-05(¶ 31).
¶ 42. Here, Patricia was indicted for deliberate-design murder, but the trial judge found Patricia guilty of manslaughter. The trial judge, acting as fact-finder, ruled out accidental death or suicide, stating that he was "not convinced beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that it ha[d] been shown that this homicide was committed with deliberate design." He stated the facts of the case indicated the killing was sudden and unexpected. Again, we find no error in this determination.
¶ 43. In the bigger picture, Patricia claims that this case is an example of what the United States Supreme Court has sought to eliminate over the years: convictions of lesser-included offenses when there is no evidence to support those offenses. Patricia cites Supreme Court precedent for her argument, which holds that in death penalty cases, due process requires the jury to consider a lesser-included non-capital offense jury instruction as a "third option" to convicting or acquitting the defendant of the indicted offense when the evidence warrants it. See Spaziano v. Florida., 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982); Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). These cases stand for the proposition that not allowing a jury instruction on the lesser-included offense in capital cases subjects the defendant to a possibility of unwarranted conviction that is not acceptable when the defendant's life is at stake. Spaziano, 468 U.S. at 454, 104 S.Ct. 3154 (citing Beck, 447 U.S. at 637, 100 S.Ct. 2382). It is noted that even though the lesser-included rule was developed to aid prosecution where the proof fails to establish the element of the crime charged, the rule can also be beneficial to the defendant, as it gives the jury a less drastic option than the death penalty. Beck, 447 U.S. at 634, 100 S.Ct. 2382 (citing Keeble v. United States, 412 U.S. 205, 208, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973)). "The goal of the Beck rule ... is to eliminate the distortion of the fact-finding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." Spaziano, 468 U.S. at 455, 104 S.Ct. 3154 (citing Beck, 447 U.S. at 638-43, 100 S.Ct. 2382). Yet, this rule and its precedent run counter to Patricia's position that the trial judge should have considered only deliberate-design murder or acquittal in her case. Patricia goes on to cite Supreme Court authority that provides that a conviction not supported by the evidence is unconstitutional. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Garner v. Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961); Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). However, the issue is not whether the defendant can be convicted of a lesser-included offense with no proof. The point is that there is no prejudice to the accused where the defendant is convicted of a lesser-included offense, where proof would have supported conviction of the greater offense. See Mallette, 349 So.2d at 550 (citing King, 251 Miss. at 179, 168 So.2d at 644).
*413 ¶ 44. We find Patricia has taken the Supreme Court authority out of its original context. Further, the longstanding law of this State, handed down by the Mississippi Supreme Court, continues to be that manslaughter is a lesser-included offense of murder, "even though manslaughter may contemplate proof of facts inconsistent with the principal charge of murder." Shaw, 880 So.2d at 304(¶ 27) (citations omitted). Accordingly, we find this issue to be without merit.

CONCLUSION
¶ 45. After a careful examination of the trial court record, we find no error justifying reversal in this case. Accordingly, we affirm the conviction and sentence.
¶ 46. THE JUDGMENT OF THE CIRCUIT COURT OF GEORGE COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH THE LAST FIVE YEARS SERVED UNDER POST-RELEASE SUPERVISION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO GEORGE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] Patricia, who had worked as a secretary, quit working six months into her marriage to Don.
[2] Tompkins could not be found for service of a subpoena to appear at trial.
[3] An attorney for State Farm Insurance Companies testified for the defense. He stated that Patricia contacted State Farm "very early on" about the life insurance. Then, her attorney sent a photocopy of Don's death certificate and demanded payment for the claim; however, State Farm wanted to investigate the death further, as the claim was still within the contestable period. The defense entered a letter into evidence, dated December 2004, that Patricia is no longer making a claim on Don's life insurance policies. However, at the time of trial, Patricia had not signed a disclaimer regarding the policies; thus, their official status was still open and pending.
[4] He further testified that the revolver did not appear abnormally dirty.